**No. 22-51124**

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

KEVIN CLARKE, TREVOR BOECKMANN, HARRY CRANE, CORWIN
SMIDT, PREDICT IT, INC., ARISTOTLE INTERNATIONAL, INC., MICHAEL
BEELER, MARK BORGHI, RICHARD HANANIA, JAMES D. MILLER,
JOSIAH NEELEY, GRANT SCHNEIDER, AND WES SHEPHERD,
*Plaintiffs-Appellants,*
v.

COMMODITY FUTURES TRADING
COMMISSION,
*Defendant-Appellee.*

_____

On appeal from the United States District Court for the
Western District of Texas (1:22-cv-00909-LY)
_____

# PLAINTIFFS-APPELLANTS' OPPOSED MOTION FOR
# INJUNCTION PENDING APPEAL OR, IN THE ALTERANTIVE,
# PETITION FOR A WRIT OF MANDAMUS

_____

Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue,
NW Washington, DC 20037
T: (202) 778-2204
medney@huntonak.com

John J. Byron*
STEPTOE & JOHNSON LLP
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
T: (312) 577-1300 / F: (312) 577-1370
jbyron@steptoe.com
*Application for admission forthcoming

*Counsel for Plaintiffs-Appellants*

January 3, 2023

## <u>CERTIFICATE OF INTERESTED PARTIES</u>

No. 22-51124

KEVIN CLARKE, ET AL.,
*Plaintiffs-Appellants,*
v.

COMMODITY FUTURES TRADING
COMMISSION,
*Defendant-Appellee.*

The undersigned counsel of record for Plaintiffs-Appellants certifies that the below listed persons and entities have an interest in the outcome of this case as described in the fourth sentence of Fifth Circuit Rule 28.2.1. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| **Appellants** | **Appellee** |
|---|---|
| Kevin Clarke, Trevor Boeckmann, Harry Crane, Corwin Smidt, Michael Beeler, Mark Borghi, Richard Hanania, James D. Miller, Josiah Neeley, Grant Schneider, Wes Shepherd, Predict It, Inc., and Aristotle International, Inc. | Commodity Futures Trading Commission |

**Counsel for Appellants**

Michael J. Edney
HUNTON ANDREWS KURTH
LLP
2200 Pennsylvania Avenue,
NW Washington, DC 20037
T: (202) 778-2204
medney@huntonak.com

John J. Byron
STEPTOE & JOHNSON LLP
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
T: (312) 577-1300 / F: (312)
577-1370
jbyron@steptoe.com

**Counsel for Appellee**

Robert A. Schwartz
*General Counsel*
Anne W. Stukes
*Deputy General Counsel*
Kyle M. Druding
*Assistant General Counsel*
U.S. COMMODITY FUTURES
TRADING COMMISSION
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Phone: (202) 418-6024
Fax: (202) 418-5127
kdruding@cftc.gov

In accordance with Federal Rule of Appellate Procedure 26.1, the undersigned counsel certifies that Plaintiff-Appellant Aristotle International, Inc. is the parent corporation of Plaintiff-Appellant Predict It, Inc. The undersigned further certifies that none of the other Plaintiffs-Appellants, including Plaintiff-Appellate Aristotle International, Inc., has any parent corporation, and no publicly held corporation holds more than 10% of their stock.

*/s/ Michael J. Edney*
Michael J. Edney
*Counsel of Record for*
*Plaintiffs-Appellants*

## STATEMENT PURSUANT TO FIFTH CIRCUIT RULE 27.4 REGARDING NEED FOR THE COURT TO ACT WITHIN A SPECIFIED TIME

Pursuant to Fifth Circuit Rule 27.4, Appellants have "serious need for the Court" to decide this Motion "within a specified time."  The PredictIt Market is a government-authorized forum for investors to trade small-scale contracts that predict the outcomes of future elections and other political event.  As detailed in the motion below, the Commodity Futures Trading Commission ("CFTC") has mandated that the PredictIt Market close and liquidate all contracts by 11:59 PM on February 15, 2023.  Appellants have challenged that decision, which contains no meaningful explanation, as arbitrary and capricious under the Administrative Procedure Act.

Investors are leaving the Market in advance of the CFTC's mandated liquidation date, reducing liquidity to historically low levels.  If current trends continue, Market liquidity may drop so low in mid- to late-January 2023 (approximately 15 to 30 days before the CFTC deadline) that the Market will cease meaningful functioning and create all the harm the requested injunction is intended to stop pending review of the merits.

Appellants took steps to avoid the need for judicial action on a very tight schedule.  They sought a preliminary injunction with the district court in September 2022 and, in a later motion to expedite, encouraged the district court to act prior to Christmas.  But the district court has not acted.  Given the imminent events that will dramatically reduce or eliminate the efficacy of any judicial relief in this action,

Appellants respectfully request that this Court order a response to the instant motion on or before January 10 or such earlier time the Court deems appropriate. Appellants will reply two days later. Appellants further request a ruling by the Court, and an injunction pending appeal, as soon as possible before January 19 to reduce the risk that the Market will cease to exist in any meaningful form before a court is able to review the merits of this action.

Appellants file this Motion on the next business day after this appeal was docketed because of its time sensitivity. Due to the timing, however, the district court has not yet transmitted the Electronic Record on Appeal to this Court and citations cannot be made to that Record. In light of these circumstances, Appellants include an appendix of key record cites for the convenience of the Court. Citations to the attached appendix are referenced herein as "App. #."

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES ........................................................i

STATEMENT PURSUANT TO FIFTH CIRCUIT RULE 27.4
REGARDING NEED FOR THE COURT TO ACT
WITHIN A SPECIFIED TIME ............................................................... iii

TABLE OF CONTENTS....................................................................v

TABLE OF AUTHORITIES ............................................................ vii

INTRODUCTION AND RELIEF REQUESTED....................................1

JURISDICTIONAL STATEMENT ........................................................4

BACKGROUND ...............................................................................6

      A.    The CFTC Authorizes the Establishment of the PredictIt
           Market. ........................................................................6

      B.    The CFTC Abruptly Shutters the PredictIt Market. ..................7

      C.    The CFTC's Direction to Liquidate All Contracts Will
           Effectively Lock Up the PredictIt Market in January and
           is Leading to Unrecoverable Compliance Costs.........................7

      D.    The District Court Fails to Act on the Appellants' Motion
           for Preliminary Injunction..........................................................9

ARGUMENT ...................................................................................10

    I.    The Court Should Issue an Injunction Pending Appeal......................10

      A.    Moving for an Injunction Pending Appeal in the District
           Court Would Be Impracticable. ................................................11

      B.    The Court Should Enjoin the Commission's Mandate to
           Liquidate All Pending Market Contracts by February 15,
           2023...........................................................................................12

           1.    Appellants Will Suffer Irreparable Harm Absent an
               Injunction. ......................................................................12

2.    Appellants Are Likely to Succeed on the Merits. ..........13

3.    The Balance of the Equities and Public Interest Weigh Heavily in Favor an Injunction. ...........................18

II.    The Court Should Issue an Injunction Pending Appeal Pursuant to 5 U.S.C. § 705. .................................................................19

III.    In the Alternative, the Court Should Issue a Writ of Mandamus........20

CONCLUSION .......................................................................................22

CERTIFICATE OF CONFERENCE.......................................................24

CERTIFICATE OF COMPLIANCE.......................................................25

CERTIFICATE OF SERVICE ...............................................................26

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott Labs v. Gardner*, 387 U.S. 136 (1967)................................................. 19, 21

*Campaign for S. Equal. v. Bryant*, 773 F.3d 55 (5th Cir. 2014)............................12

*Data Marketing Partnership v. U.S. Department of Labor*, 45 F.4th 846 (5th Cir. 2022) ...................................................................................... 2, 16, 17

*Hebert v. Exxon Corp.*, 953 F.2d 936 (5th Cir. 1992) ............................................20

*In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283 (5th Cir. 2015) .........................21

*In re Metro. Gov't of Nashville & Davidson Cnty*, 606 F.3d 855 (6th Cir. 2010) ..20

*In re United States ex rel. Drummond*, 886 F.3d 448 (5th Cir. 2018).....................20

*In re Volkswagen*, 545 F.3d 304 (5th Cir. 2008) ...................................................21

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020) ...............5

*McCoy v. La. State Bd. of Ed.*, 332 F.2d 915 (5th Cir. 1964)...............................5, 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...................................................................................... 14, 15

*Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992)....................5

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.C. Cir. 2009).............19

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................18

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406 (5th Cir. 2013) ...................................................................................12

*Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981)........................................................14

*Sackett v. EPA*, 566 U.S. 120 (2012) ....................................................................17

*Chem. Weapons Working Grp. (CWWG) v. Dep't of the Army*, 101 F.3d 1360 (10th Cir. 1996)...................................................................................11

*State v. Biden,* 10 F.4th 538 (5th Cir. 2021) .........................................................15

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019)........................................................16

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016)...........................................................20

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ..........................16

*Wages and White Lions Invs., LLC v. FDA*, 16 F.4th 1130 (5th Cir. 2021)..... 13, 20

*Will v. Calvert Fire Ins. Co.*, 437 U.S. 655 (1978)...................................................20

**Statutes**

28 U.S.C. § 1292 ........................................................................ 4, 6, 21

5 U.S.C. § 702 ...................................................................................3

**Other Authorities**

*Arbitrary*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981)...............15

**Rules**

5 U.S.C. § 705 .......................................................................... 4, 19, 21

Federal Rule of Appellate Procedure 8 .............................................4, 11

Fifth Circuit Rule 27.4 ..............................................................................4

**Treatises**

Wright & Miller, Federal Practice and Procedure § 2962 (3d ed.) ..........................4

**Regulations**

17 C.F.R. § 140.99 ...................................................................... 6, 15, 18

## INTRODUCTION AND RELIEF REQUESTED

The PredictIt Market ("the Market") is a market for trading contracts that predict outcomes of political events such as elections. It has operated for more than eight years under a Commodity Futures Trading Commission ("CFTC") decision authorizing its establishment. This case arises from an August 4, 2022, decision by the CFTC that abruptly revoked the Market's permission to operate and commanded it to shut down.

The revocation decision included no meaningful explanation. Most strikingly, the revocation directed PredictIt—in no uncertain terms—to force all traders out of their contracts by midnight on February 15, 2023. In doing so, the CFTC seeks to prematurely terminate contracts that predict the outcome of the 2024 presidential primary and general elections, contracts that investors bought expecting they would trade until those elections occurred. Appellants asked the district court for a preliminary injunction against enforcement of this February 2023 liquidation mandate; the district court did not act; and Appellants now ask this Court to provide such an injunction.

The Commission's decision to close the Market—particularly picking from thin air a February 2023 date by which all pending contracts must be liquidated—is arbitrary and capricious in violation of the Administrative Procedure Act. The APA required, at a minimum, an explanation for why the Market must close and why the

February 2023 date was the only way to accomplish whatever unspoken policy objectives motivated the Commission's decision.

And the Commission's unnecessary invention of the February 2023 liquidation date is creating the need for urgent judicial intervention. The Commission's liquidation mandate is not just a February 15, 2023, problem. It is causing irreparable harm today. More and more traders and liquidity have been leaving the Market through December, stranding the investors who remain with pricing that is unconnected to projections about the outcome of elections. At some point in January, it is likely that there will not be a meaningfully functioning market left to save. All of this will have been caused by a federal government agency with sovereign immunity, leaving no defendant available for compensating these harms. This is the definition of the irreparable harm for which a preliminary injunction is appropriate.

The Plaintiffs are likely to succeed on the merits. Below, the Commission engaged in *no substantive defense of its decision*. Instead, the Commission raised two procedural objections, seeking to insulate its decision from judicial review. Neither has merit.

First, the CFTC contends its decision was not final agency action. That assertion cannot survive this Court's recent decision in *Data Marketing Partnership v. U.S. Department of Labor*, 45 F.4th 846 (5th Cir. 2022). Judge Oldham, writing

for a unanimous Court, rejected every argument the Commission makes here.  The CFTC says the decision is not final because it was made by staff in its Division of Market Oversight.  But agency staff regularly makes decisions that are final agency action.  *See id.* at 854.  Nor does it matter that the agency characterizes its decision as "advisory" or "subject to change."  *Id.* at 853–54.  Instead, the key question is whether the agency decision is "not subject to further [a]gency review."  *Id.*  And no one claims the agency decision to end the Market can be appealed to anyone inside the agency.

Second, the CFTC has complained that Victoria University of Wellington, New Zealand—the entity that applied to the agency for authorization to run the Market—did not travel 7500 miles to formally participate as a party in this case.  In the University's absence, the CFTC says, we just don't know whether the University would have chosen to close the Market anyways.  But University officials have submitted statements for the record making clear the CFTC's decision is the only reason that tens of thousands of traders will be thrown out of their contracts by February 15, 2023.  In any event, the companies that operate the Market for the University and the traders who purchased contracts in reliance on the Commission having authorized the Market are among those "aggrieved by the agency's decision" and authorized to sue under the APA.  5 U.S.C. § 702.

Appellants move for an injunction pending appeal pursuant to Federal Rule of Appellate Procedure 8(a)(2) and 5 U.S.C. § 705. Specifically, Appellants ask that the Court enjoin the enforcement of the Commission's February 15, 2023, liquidation mandate and allow the PredictIt Market event contracts that were offered as of the date of the agency's decision, particularly those concerning the 2024 presidential elections, to continue trading pending the resolution of this appeal. In the event of any doubt regarding direct appellate jurisdiction, Appellants ask that the Court provide similar relief through mandamus. Because the Market likely will effectively cease meaningful functioning in mid- to late-January, Appellants request that the Court act on this motion/petition prior to January 19, 2023. *See* Statement Pursuant to Fifth Circuit Rule 27.4, *supra*.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal because the district court effectively "refused" Appellants request for a preliminary "injunction." 28 U.S.C. § 1292(a)(1). This Court has jurisdiction under Section 1292(a)(1) "when a court declines to make a formal ruling on a motion for a preliminary injunction, but its action has the effect of denying the requested relief." Wright & Miller, Federal Practice and Procedure § 2962 (3d ed.). Accordingly, this and other courts of appeals have exercised appellate jurisdiction when district courts have delayed ruling on a preliminary injunction request while the harm sought to be prevented occurs. *See*

*McCoy v. La. State Bd. of Ed.*, 332 F.2d 915, 916–17 (5th Cir. 1964) (not ruling on preliminary injunction request regarding school policies until after school session had begun had "practical effect" of denying injunction); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1449–51 (9th Cir. 1992) (delaying hearing on preliminary injunction motion to stop construction until after it had occurred "effectively denied the motion"); *see also Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612 (6th Cir. 2020) (preliminary injunction motion effectively denied when district court showed no indication of ruling before harm occurred).

That is what happened here. The district court effectively refused to enter a preliminary injunction by failing to act. After no hearing was scheduled on the fully briefed preliminary injunction motion for more than a month, Appellants filed a motion to "expedite" consideration of that motion and requested that it be heard and ruled upon by Christmas. The expedition request documented that, because of accelerating irreparable harm in December and into January, the motion would be effectively denied without a pathway to decision by Christmas.

Indeed, the district court entered orders prioritizing certain procedural issues over the time-sensitive motion for a preliminary injunction. *See* App. 37, 54. In line with this Court's decision in *McCoy*, the Appellants have taken an appeal from those orders, in addition to the district court's effective denial of the preliminary injunction

5

request. *McCoy*, 332 F.2d at 916–17 (orders prioritizing procedural question and over consideration of a motion for a preliminary injunction are appealable).

In the event of any doubts about jurisdiction pursuant to 28 U.S.C. § 1292 regarding orders refusing preliminary injunctions, Appellants alternatively request a writ of mandamus directing the district court to enter a preliminary injunction. The grounds for mandamus are detailed below.

## BACKGROUND

### A. The CFTC Authorizes the Establishment of the PredictIt Market.

Since 2014, the PredictIt Market has provided members of the public an opportunity to make investments based on their predictions of future elections and other significant political events.

The Market was born from a 2014 CFTC ruling. That ruling approved Victoria University's formal application to establish the Market. App. 18. That ruling took the form of "no-action relief," a category of agency decision expressly provided for in the Commission's regulations. *Id.*; *see also* 17 C.F.R. § 140.99.

Based on the CFTC approval, the University and Appellants Aristotle Inc. and Predict It, Inc. ("Market Operators") invested millions to set up the Market. Under rules set by the CFTC, participation in the Market is limited. No one can invest more than $850 in any one contract. And each contract market is limited to 5000 participants. These rules are meant to balance providing data to academics on the

6

public's investment-backed predictions regarding political events, while giving no one market participant too great a financial stake in any one election. These data offer researchers a wealth of information that has advanced the fields of microeconomics, political behavior, computer science, and game theory. *See* App. 31–33, Crane Decl.; App. 34–36, Smidt Decl.; App. 76–79, Lowery Decl.

### B. The CFTC Abruptly Shutters the PredictIt Market.

On August 4, 2022, the CFTC ordered the PredictIt Market to close and to liquidate tens of thousands of private investor contracts before midnight on February 15, 2023. App. 25–26. The Revocation gave only the following reason: The Market "has not [been] operated in compliance with the terms of" the agency decision authorizing the Market's opening. App. 26. Its liquidation mandate was specific to the minute:

> To the extent the University is operating any contract market, as of the date of this letter, in a manner consistent with each of the terms and conditions provided in [CFTC] Letter 14-130, all of those related and remaining listed contracts and positions comprising all associated open interest in such market should be closed out and/or liquidated no later than 11:59 p.m. eastern on February 15, 2023.

*Id*. Many contract markets have a deciding event that occurs after February 15, 2023. Most prominent are those concerning the outcome of the 2024 presidential election.

### C. The CFTC's Direction to Liquidate All Contracts Likely Will Lock Up the PredictIt Market in January.

PredictIt Market investors, academics who study Market data, and the companies operating the Market promptly sued the Commission. They sought a

preliminary injunction against the mandate that contracts be liquidated early, by February 15, 2023.

The Appellants who are Market investors purchased contracts before the CFTC's decision to end the Market, in the expectation that they would continue to trade until their deciding events. *See, e.g.*, App. 65–66 at ¶ 3. The CFTC's liquidation mandate is distorting and disturbing Market trading today, well in advance of the February 15, 2023 deadline. The contacts are trading at prices disconnected from predictions of election outcomes, as traders attempt to salvage their investments. App. 66–68 at ¶ 5, 9. The Appellants today cannot exit their contracts except at a loss as compared to what they believe they would have recovered.

Because of the liquidation mandate, traders are exiting the Market in numbers that have left the Market with historically low liquidity. Approximately 2000 traders withdrew all of their funds and closed their accounts in December alone. Exhibit 1, Phillips Decl., at ¶ 4. The number of active daily traders this month has decreased to 35 percent, and trading volume to 24 percent, of long-term averages. *Id.* at ¶ 7. If these trends to continue, the Market will have so little liquidity that it will effectively lock up 15–30 days prior to the CFTC's liquidation deadline, that is, by mid- to late-January 2023. *Id.* at ¶ 8.

The Market Operators also must prepare for the February 15 liquidation deadline and make significant investments in systems that will implement the Commission's mandate. Those investments started in December and are continuing. App. 70–74 at ¶¶ 3, 6–9.

### D. The District Court Fails to Act on the Appellants' Motion for Preliminary Injunction.

The Appellants did not seek a preliminary injunction that would have completely stopped the termination decision and allowed the Market to offer contracts on entirely new elections or political events. Instead, Appellants made a targeted request for an injunction that would have permitted contracts offered as of August 4 to continue trading beyond the February 15, 2023 liquidation date, pending resolution of the merits. App. 56. Briefing of the motion was fully completed on October 20. App. 38.

While the request for a preliminary injunction was pending, the district court prioritized two less time-sensitive motions—a motion to transfer venue and a motion to dismiss—referring both to a magistrate judge for resolution. *See* App. 37, 54. A month after the preliminary injunction motion had been fully briefed, the district court had neither scheduled a hearing nor taken any other action on the motion. To address this situation, Appellants moved to expedite consideration of the motion on November 18. App. 55. Therein, Appellants provided updated facts showing the projected acceleration of irreparable harm in December 2022. They projected that,

absent a preliminary injunction, traders would exit the market in so great of numbers that the Market's liquidity and ability to function would be compromised beginning in mid-December. App. 57–58; App. 70. They also detailed the hundreds of thousands of dollars needed to be spent, beginning in December, to build electronic systems to liquidate contracts on or before February 15, 2023. App. 70–74 at ¶¶ 3, 6–9. The Appellants asked the Court to set a hearing designed to resolve the preliminary injunction motion by Christmas. If it had not been resolved by then, Appellants informed the Court that they would regard the motion as effectively denied. App. 60. The district court did not respond to the motion to expedite.

In the meantime, the magistrate judge held a hearing on the motions to transfer and to dismiss. On December 12, the magistrate judge issued a report and recommendation that the district court to grant the CFTC's motion to transfer the case to the District of Columbia. On December 27, 2022, the Appellants filed an objection to the report and recommendation with the district court.

Appellants appealed the district court's effective denial of the preliminary injunction motion on December 23, 2022.

## ARGUMENT

### I.    The Court Should Issue an Injunction Pending Appeal.

The CFTC's unreasoned mandates are causing irreparable harm that merits an injunction pending appeal. February 15, 2023—the Commission's crash-landing

date for all trader contracts—is only a month-and-a-half away. In advance of that date, traders are exiting the Market in historical numbers. If an injunction is not issued in January, there likely will not be a functioning Market to save when a court reaches the merits of this matter. At the same time, the Commission has identified *no* countervailing interest in enforcing the arbitrarily-chosen February 15, 2023, liquidation date. An injunction pending appeal would prevent this case from turning into an almost entirely academic exercise.

### A.    Moving for an Injunction Pending Appeal in the District Court Would Be Impracticable.

Parties may move for an injunction pending appeal in the court of appeals if "moving first in the district court would be impracticable." Fed. R. App. P. 8(a)(2)(A)(i). It would be impracticable here. First, the district court has not acted on the pending preliminary injunction motion, which seeks almost identical relief. *See Chem. Weapons Working Grp. (CWWG) v. Dep't of the Army*, 101 F.3d 1360, 1362 (10th Cir. 1996) (when proceedings in the district court show its "commitment to a particular resolution," moving for a stay first in the district court is not required under Rule 8).

Second, with Appellants facing an imminent date after which no judicial relief will effectively mitigate irreparable harm, time does not remain for moving first in the district court, which would needlessly compound proceedings and cause delay inconsistent with the now-emergency situation. *See*, *e.g.*, *Planned Parenthood of*

11

*Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410–11 (5th Cir. 2013) (seeking relief in district court was impracticable when challenged law took effect immediately).

**B.    The Court Should Enjoin the Commission's Mandate to Liquidate All Pending Market Contracts by February 15, 2023.**

To issue an injunction pending appeal, the Court weighs: (1) the likelihood of the movant succeeding on the merits; (2) the irreparable harm that will occur in the absence of an injunction; (3) whether the injunction will cause substantial harm to other parties; and (4) whether the injunction is in the public interest. *Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014).  Each of these factors weighs in favor of issuing an injunction.

**1.    Appellants Will Suffer Irreparable Harm Absent an Injunction.**

Because of the imminent February 15, 2023, liquidation deadline, the Market has reached an inflection point requiring this Court's intervention.  Many traders are now pulling their money from the Market because the liquidation mandate will cut off their investments before the 2024 elections those investments predict.  This flight of investors is leaving a market with low liquidity and, in turn, is forcing remaining investors to sell their contracts at an arbitrary loss rather than trade into a market still predicting the outcome of those elections.  In December, daily trading volume fell

to 24 percent of its historical averages. Ex. 1 at ¶ 7. If this Court does not enjoin the liquidation mandate in the coming weeks, there will not be a market left to save.

The companies operating the Market are in the course of plunging hundreds of thousands of dollars into developing the infrastructure necessary to comply with the mandate. App. 57–58; App. 65–66 at ¶ 3. Those entities have systems to pay a contract in full when an event occurs; they lack systems to somehow pay some other price—like current market price or purchase price—on an arbitrary date. This investment was required to begin in mid-December and will continue into January.

There will be no party against whom damages for these harms can be recovered. The unnecessary losses of traders, the damage to a previously well-functioning market, and the costs of complying with the Commission's mandate are all caused by the arbitrary decisionmaking of a federal government agency. But the federal government is immune from claims for economic damages, making these harms "irreparable." *Wages and White Lions Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

### 2. Appellants Have Presented Serious Legal Questions That the CFTC's Decision to End the Market Violates the Administrative Procedure Act.

Appellants' likelihood of success on merits also weighs in favor of an injunction pending appeal. To satisfy this factor, they "need only present a substantial case on the merits" involving "a serious legal question." *Ruiz v. Estelle*,

650 F.2d 555, 565 (5th Cir. 1981). Here, the agency decision is not adequately explained, and the agency is only contending that these deficiencies are no business of the courts. This administrative effort to upend the investments of Market participants, at a minimum, raises the serious legal questions that merit an injunction pending appeal.

The CFTC's decision to terminate the Market and mandate the premature liquidation of the contracts of tens of thousands of traders by February 15, 2023, is plainly arbitrary and capricious. The decision barely contains an explanation, much less one that constitutes the "reasoned decisionmaking" required by the APA. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). It summarily concludes: "The University has not operated its market in compliance with" the rules set forth in the CFTC's authorization of the Market. App. 26. It provides no specific allegation regarding how the Market failed to comply, much less facts supporting such an allegation.

Nor did the termination decision provide any explanation for its mandate for how the Market must close—by liquidating all trader contracts, even those purchased in good faith before the termination decision, before 11:59 PM on February 15, 2023. That date and time was seemingly picked from thin air. It is the dictionary definition of "arbitrary:" "Coming about seemingly at random or by chance; determined by individual preference or convenience than by the necessity

or intrinsic nature of something." *Arbitrary*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981). The decision also contains no analysis of less burdensome alternatives for closing the Market. Such alternatives include barring the opening of contracts for new political events, while allowing contract markets existing as of the date of the termination decision to trade until the elections they predict occur. Under the APA, an agency must consider and explain the rejection of alternatives to an agency's policy choice that are less disruptive to regulated parties. *State Farm*, 463 U.S. at 50; *State v. Biden,* 10 F.4th 538, 552–53 (5th Cir. 2021).

The CFTC never tried to defend the substantive adequacy of its termination decision. Instead, in proceedings below, the Commission claimed its decision to end the Market is not subject to any judicial review. The Commission is wrong: When it decides to pull a Market's authorization to operate after seven years, it must explain itself and defend the adequacy of its explanation in the courts.

The Commission has claimed the decision terminating the PredictIt Market is not "final agency action" and is thus insulated from judicial review. But the decision to authorize the Market—as well as the decision mandating its closure in detail— was not some informal opinion by a subordinate agency official. Instead, it was the grant (and revocation) of a specific form of "relief" provided by agency regulations. *See* 17 C.F.R. § 140.99.

15

Importantly, the termination decision issues specific instructions of how the Market must close, down to the minute—11:59PM on February 15, 2023—it must happen. It threatens enforcement action for non-compliance with these instructions. And it is appealable to no one. When the decision of a subordinate agency official threatens sanctions for non-compliance and cannot be appealed, it bears all the hallmarks of final agency action. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016) ("As we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'"). And, practically speaking, the decision means the end of the Market, in which its operators have invested millions in establishing systems for running it and in which its traders have invested tens of millions in reliance on the basic assumption that the contracts offered will be permitted to run their natural course. The "Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019); *Data Marketing Partnership v. U.S. Dep't of Labor*, 45 F.4th 846, 853 (5th Cir. 2022) (same).

The Commission also has relied heavily on sentences in the 2014 decision authorizing the Market's establishing that the Commission might later reverse course. In *Data Marketing Partnership v. U.S. Department of Labor*, however, this Court held that such statements cannot block judicial review. 45 F.4th 846. There,

this Court decided that an "advisory opinion"—issued by a member of the Department of Labor's staff—qualifies as "final agency action." And just as here, the agency argued that it had warned the recipient it could change its mind at any time. *Id.* at 854. As this Court explained:

> [T]he Department recycles an argument that the Supreme Court has repeatedly rejected: The action isn't final because the agency can change its position or its reasons for the decision after more factfinding. This argument is squarely foreclosed by numerous Supreme Court decisions.

*Id.* (citing *Hawkes*, 578 U.S. 590, among others). Instead, the Fifth Circuit stressed that the key question—even for agency opinions characterized as "advisory" and "subject to change"—is whether the opinion is "not subject to further [a]gency review." *Id.* at 853–54 (citing *Sackett v. EPA*, 566 U.S. 120, 127 (2012)).

There, as here, the agency "effectively concedes that the [agency action] is not subject to additional agency review." *Id.* at 854. Without any additional process, the CFTC's decision to end the PredictIt Market was final agency action.

The Commission also claimed it had nothing to answer for, because the University that it authorized to open the Market did not formally join the case as a plaintiff. Nothing in the 2014 agency decision green-lighting the Market, however, says that decision was meant only to benefit the University, to the exclusion of the investors who would buy the contracts offered by the Market. To the contrary, the 2014 decision specifically contemplated that investors from all walks of life would

be offered political event contracts. *See* App. 18–23. Indeed, CFTC regulations say that any "[b]eneficiary" of no-action relief—not just the "recipient" or the "person on whose behalf the [relief] is sought" as used in other parts of the regulations—may rely on the relief. *Compare* 17 C.F.R. § 140.99(a)(2) *with* §§ 140.99(c), (e).

And, although the University is not traveling 7500 miles from New Zealand to participate, it has made its position clear. Victoria would not have closed the PredictIt Market, much less kicked investors out of their contracts, but for the CFTC's arbitrary mandate to do so. App. 52 (Victoria Univ. Ltr.).

### 3.    The Balance of the Equities and Public Interest Weigh Heavily in Favor an Injunction.

The balance of equities and public interest "merge when the Government" is the party opposing a preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The requested injunction does not seek to permit entirely new contracts or to overturn the decision eventually to close the Market (although the underlying lawsuit does seek that relief). Instead, it is targeted at preventing harm caused by the specific requirement to crash land contract markets, existing as of the date of the Commission's abrupt decision to end the Market, by an arbitrary date in February.

There is no other side of the ledger regarding the requested injunction. The Commission has never explained what is so special about February 15, or why already existing contract markets cannot be permitted to trade past then or until the elections they predict occur, even if there is some reason to wind down the Market

eventually.  Without any articulated government, much less public, interest in this invented February liquidation date, entering an injunction that keeps the Market somewhat alive while the merits are being reviewed is clearly warranted.

In any event, the "public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.C. Cir. 2009).

## II.    The Court Should Pause the Agency's Decision Pending Judicial Review Pursuant to 5 U.S.C. § 705.

Through Section 705 of the APA, Congress provided a further mechanism to preserve the status quo until an agency's action is judicially reviewed.  Section 705 provides that, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, *including the court to which a case may be taken on appeal* . . . , may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705 (emphasis added).

This is precisely the type of case in which the Court should exercise its statutory authority.  Absent Section 705 relief or an injunction pending appeal, the challenged agency decision to end the Market will become a *fait accompli*.  When an agency decision is causing irreparable harm and will otherwise have had all its intended effects before judicial review occurs, the Court should postpone its effective date or otherwise stay its effect under Section 705.  *Wages & White Lion*

*Invs., LLC.*, 16 F.4th at 1142–44 (stay under § 705 "to preserve the *status quo ante*" and prevent unrecoverable compliance costs); *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (stay under § 705 when harm would otherwise occur prior to judicial review).

## III.    In the Alternative, the Court Should Issue a Writ of Mandamus.

To the extent the Court has any doubts about its direct appellate jurisdiction, Appellants respectfully request that the Court treat this filing as a petition for a writ of mandamus and direct the district court to enter the requested preliminary injunction.

If the Court refuses to exercise jurisdiction over this interlocutory appeal, Appellants will "lack adequate alternative means to obtain" relief before it is too late. *Hebert v. Exxon Corp.*, 953 F.2d 936, 938 (5th Cir. 1992). Moreover, "[t]here can be no doubt that, where a district court persistently and without reason refuses to adjudicate a case properly before it, the court of appeals may issue the writ." *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661–62 (1978). To that end, this Court has granted mandamus relief when a district court has delayed the resolution of a critical motion to an extent that it effectively denies the relief requested. *In re United States ex rel. Drummond*, 886 F.3d 448, 450 (5th Cir. 2018); *see also In re Metro. Gov't of Nashville & Davidson Cnty*, 606 F.3d 855, 867 (6th Cir. 2010).

In this case, if Appellants do not receive preliminary relief in the coming weeks, there will no longer be a PredictIt Market to save. Without a decision on this "critical aspect of the case," the Market will be forced to close and Appellants' good faith challenge to the Commission's arbitrary decision will become almost entirely an academic question. *See In re Volkswagen*, 545 F.3d 304, 319 (5th Cir. 2008) (granting mandamus when harm otherwise could not "be put back in the bottle"); *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 289 (5th Cir. 2015) (mandamus where "the very harm sought to be avoided . . . will have worked irreversible damage and prejudice by the time of final judgment").

Issuing a writ is more appropriate here because it would advance Congress's decision to provide prompt appellate review when district courts decline to stop irreparable harm during the pendency of a case, particularly with regard to the decisions of administrative agencies. This policy is reflected in U.S. Code Title 28, which provides for immediate appeals of orders refusing injunctions. 28 U.S.C. § 1292. It is also found in Section 705 of U.S. Code Title 5: When a serious challenge to an agency decision is presented, the best course is to delay aspects of that decision causing irreparable harm until the Court can address the merits of that challenge. *See* 5 U.S.C. § 705; *Abbott Labs v. Gardner*, 387 U.S. 136, 156 (1967).

This Court's issuance of mandamus would fill small gaps in a web of congressional decisions to make sure the appellate courts can weigh in on

administrative agency behavior before it has done its worst to the regulated public. The People's elected representatives have delegated great responsibility to unelected administrative agencies, on the crucial condition that the courts will ensure that at least their decisions are explained.  If the inaction of one level of the judiciary can thwart that crucial check of administrative power, this delicate reconciliation of unelected officials making monumental decisions and representative democracy will have been disrupted.

## **CONCLUSION**

Appellants ask that the Court enjoin the CFTC from enforcing the revocation letter's February 15, 2023, cut-off date during the pendency of this appeal against the PredictIt Market contracts that would naturally resolve after that date or grant mandamus relief to effect the same result.

Respectfully submitted,

/s/ *Michael J. Edney*

Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue,
NW Washington, DC 20037
T: (202) 778-2204
medney@huntonak.com

John J. Byron*
STEPTOE & JOHNSON LLP
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
T: (312) 577-1300 / F: (312) 577-1370
jbyron@steptoe.com
*Application for admission forthcoming*

*Counsel for Plaintiffs-Appellants Kevin Clarke, Trevor Boeckmann, Harry Crane, Corwin Smidt, Predict It, Inc., Aristotle International, Inc., Michael Beeler, Mark Borghi, Richard Hanania, James D. Miller, Josiah Neeley, Grant Schneider, and Wes Shepherd*

## **CERTIFICATE OF CONFERENCE**

I hereby certify that on December 29, 2022, counsel for Plaintiffs-Appellants corresponded with opposing counsel concerning their position on this motion. Opposing counsel informed counsel for Plaintiffs-Appellants that the Appellee opposes this motion.

*/s/ Michael J. Edney*
Michael J. Edney
*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitations of Rules 29(a)(5) and 32(a)(7)(B), because it contains 5,175 words, excluding the parts exempted by Rule 32(f), according to the count of Microsoft Word.

*/s/ Michael J. Edney*

Michael J. Edney
*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2023, I electronically filed this brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system. I further certify that Counsel for Appellee, Kyle Druding, has been served by email at the address listed below:

Kyle M. Druding
*Assistant General Counsel*
U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Phone: (202) 418-6024
Fax: (202) 418-5127
kdruding@cftc.gov


*/s/ Michael J. Edney*
Michael J. Edney
*Counsel for Plaintiffs-Appellants*

No. 22-51124

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

KEVIN CLARKE, TREVOR BOECKMANN, HARRY CRANE, CORWIN
SMIDT, PREDICT IT, INC., ARISTOTLE INTERNATIONAL, INC., MICHAEL
BEELER, MARK BORGHI, RICHARD HANANIA, JAMES D. MILLER,
JOSIAH NEELEY, GRANT SCHNEIDER, AND WES SHEPHERD,
*Plaintiffs-Appellants,*
**v.**

COMMODITY FUTURES TRADING
COMMISSION,
*Defendant-Appellee.*

_____

**On appeal from the United States District Court for the
Western District of Texas (1:22-cv-00909-LY)**

_____

# APPENDIX TO PLAINTIFFS-APPELLANTS' OPPOSED
# MOTION FOR INJUNCTION PENDING APPEAL OR, IN THE
# ALTERANTIVE, PETITION FOR A WRIT OF MANDAMUS

_____

Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue,
NW Washington, DC 20037
T: (202) 778-2204
medney@huntonak.com

John J. Byron*
STEPTOE & JOHNSON LLP
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
T: (312) 577-1300 / F: (312) 577-1370
jbyron@steptoe.com
*Application for admission forthcoming*

*Counsel for Plaintiffs-Appellants*

January 3, 2023

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| KEVIN CLARKE, in his individual capacity, TREVOR BOECKMANN, in his individual capacity, HARRY CRANE, in his individual capacity, CORWIN SMIDT, in his individual capacity, PREDICT IT, INC., a Delaware corporation, and ARISTOTLE INTERNATIONAL, INC., a Delaware corporation, | Case No. 22-cv-00909-LY |
| Plaintiffs, | |
| v. | |
| COMMODITY FUTURES TRADING COMMISSION, | |
| Defendant. | |

**APPENDIX TO PLAINTIFFS'
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| KEVIN CLARKE, in his individual capacity, TREVOR BOECKMANN, in his individual capacity, HARRY CRANE, in his individual capacity, CORWIN SMIDT, in his individual capacity, PREDICT IT, INC., a Delaware corporation, and ARISTOTLE INTERNATIONAL, INC., a Delaware corporation, | Case No. 2022-cv-00909 |
| Plaintiffs, | |
| v. | |
| COMMODITY FUTURES TRADING COMMISSION, | |
| Defendant. | |

## DECLARATION OF DEAN PHILLIPS

Pursuant to 28 U.S.C. § 1746, I, Dean Phillips, do hereby declare:

1.      My name is Dean Phillips.  I am the President and Co-Founder of Aristotle International, Inc. ("Aristotle").  I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I have personal knowledge of the facts stated herein.

3.      In 2014 Victoria University of Wellington ("Victoria University") petitioned for and was granted no-action relief from the CFTC, allowing it to operate a political-event contract market.  A true and correct copy of Victoria University of Wellington's Request for No-Action Letter for a Small-Scale, Not-For Profit, Event Futures Market for Educational Purposes (the "Request") is attached hereto as Exhibit 1.  A true and correct copy of the CFTC Letter No. 14-130 (the "No-Action Relief") is attached hereto as Exhibit 2.

4.     Aristotle International, Inc. assisted Victoria in assembling that application and shepherding it through the CFTC's regulatory process.  Once the CFTC issued the decision that permitted the Market to open, Victoria entered into a contract with Aristotle International Inc. and its subsidiary Predict It, Inc. ("PredictIt") to serve as clearing house and support the Market on the day-to-day basis.

5.     Aristotle invested over seven million dollars to stand up the PredictIt Market, after the agency's decision to permit its operations.  It developed a software backbone and internet interface for the Market.  It hired, trained, and maintains an employee base of seven fully dedicated (full time) employees and 18 employees who split time between PredictIt and other Aristotle businesses to clear trades and to ensure compliance.  It established policies, procedures, and a compliance environment to ensure that the Market is not misused.  All this and more was performed pursuant to a market-servicing agreement with Victoria.  Specifically, PredictIt serves as the internet distributor of the user-generated predictive content offered on the PredictIt Market. Aristotle and PredictIt's investments have resulted in the technological infrastructure for the PredictIt Market, including the design of the Market's trading engine, clearing operations, state-of-the-art investor due-diligence systems, and anti-money-laundering controls.

6.     Since its inception and throughout its operation, the PredictIt Market has imposed certain restrictions on trader investments pursuant to the terms of the No-Action Relief.  Traders may not invest funds in excess of $850 in any one event contract, and the number of active investors in any one event contract is limited to 5000.

7.     Within these limitations, the Market hosts dozens of contract markets at a given time, each of which includes one or more questions about the outcome of a future political event.

**4**

Each question is binary—having a yes or no answer—and investors' positions on the answer to each question are known as "contracts."

8.      Each contract is traded for prices less than one dollar that reflect the probability of various event outcomes occurring based on traders' collective beliefs.  When the event ultimately occurs, contracts predicting the correct outcome are redeemed for one dollar while incorrect predictions receive no payout.

9.      The subject matter of each event contract offered on the Market is related to the outcome of future elections and other significant political events, as authorized by the No-Action Relief.  Victoria University's Request for No-Action Relief sought approval to issue contracts concerning the outcome of elections and other "significant Political Events," unrelated to "terrorism, assassination or war."  Ex. 1 at 3.  The No-Action Relief, approving the scope of the proposed definition of political event contracts in the Request, summarizes that "the proposed submarket for political event contracts will include winner-take-all contracts to predict the following outcomes:

- Which presidential nominee will win his or her party's primary, the general election popular vote, and the Electoral College;

- Who will be the major party nominee for Vice President; and

- Which party will control the next Congress."

Ex. 2.  The letter made clear that the examples listed were not exclusive by using the word "include" and referenced approvingly, summarized, and made no apparent attempt to constrict the description of the proposed political event market in Victoria University's request for no-action relief.  *Id.*; Ex. 1.  Further, in a 2014 email, the CFTC Division of Market Oversight's Chief Counsel David Van Wagner acknowledged that the three examples of political contracts were "non-exclusive."  A true and correct copy of the 2014 email is attached hereto as Exhibit 4.

10.     On August 4, 2022, the CFTC revoked the No-Action Relief in CFTC Letter No. 2208 (the "Revocation").  A true and correct copy of the Revocation is attached hereto as Exhibit 3.

11.     The Revocation generally describes the terms of the No-Action Relief and summarily states that Victoria University "has not operated its market in compliance with the terms of [the No-Action Relief]."  Ex. 1 at 2.  The Revocation further orders that all PredictIt contract markets close or liquidated by February 15, 2023, prohibits listing of new or related contracts, and orders the immediate liquidation of contract markets not operating "in a manner consistent with each of the terms and conditions provided" in the No-Action Relief.  *Id.*

12.     In the absence of an explanation from the CFTC of why or how the agency believes the PredictIt Market is not operating in compliance with the terms of the No-Action Relief, there is no clear way to determine which of the Market's contract markets are purportedly noncompliant and must be liquidated immediately.

13.     In nearly eight years of operation of the PredictIt Market, 177,293 individual investors have traded in 8,059 markets including 4,483 on the outcome of elections and other significant political questions.  During the year prior to the Revocation, 35,664 unique traders participated in 728 separate  markets hosted on the PredictIt Market, investing in more than 14,000 event contracts predicting the outcome of elections and other significant political questions.  When the Revocation was issued, PredictIt hosted roughly 550 event contracts.[1]

14.     Of the contracts that will close before the February 15, 2023 shut-down date, it is uncertain which are part of contact markets the CFTC believes are being operated "in a manner

---

[1]     Of the 728 contract markets hosted by the PredictIt Market during the year preceding the Revocation, 178 closed—their deciding event occurred—before the Revocation was issued.

6

[in]consistent with . . . the terms and conditions" of the No-Action Relief and must be liquidated immediately.

15.     Even assuming all PredictIt Market contract markets are operating within the parameters of the No-Action Relief, at least 75 event contracts—in which 14,478 traders have invested—would not ordinarily close until after the February 15, 2023 shut-down date, but for the Revocation.  Many of the contracts concern the outcome of various U.S. elections in 2024 cycle, including the U.S. presidential primary and general elections.  These presidential election contracts generally have been the most watched and frequently traded contracts PredictIt offers.

16.     For event contracts that must be liquidated before their deciding event occurs, there is no standard by which they should be valued.  Ordinarily, these contracts could be traded up to their deciding event at which time contracts predicting the correct outcome are redeemed for one dollar and incorrect-outcome contracts become valueless.  For prematurely liquidated contracts, it is unclear whether those contracts should be cashed out at their value on the date of liquidation, at the value for which they were purchased, or for some other amount.

17.     This premature liquidation and uncertainty regarding which contract markets must be liquidated and when are subjecting Aristotle and PredictIt to massive administrative, labor, time, and other costs.  Since the Revocation, Aristotle and PredictIt personnel have met daily to determine how and when PredictIt Market contract markets must be shut down and to address the many investor calls and emails seeking clarity on if, how, and when PredictIt Market contracts will be liquidated.  Even when the correct timing and manner of premature liquidation is determined, numerous systems must be set up—including software infrastructure—to effect a premature payout.  The development of these systems will require programmers, accountants, and financial

analysts to expend at least 2,500 hours of time and effort.  And Aristotle and PredictIt will bear

the cost associated with their labor, which we are currently budgeting in the amount of $250,000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2022

_____

Dean Phillips

# Exhibit 1



<u>Confidential Treatment Requested by Victoria University of Wellington</u>

June 26, 2014                                          <u>Request Under 7 U.S.C. Sec. 6(a)</u>

Vince A. McGonagle

Director

The Division of Market Oversight

Commodity Futures Trading Commission

Three Lafayette Centre

1155 21st Street, NW

Washington, DC 20581

       RE:    <u>VICTORIA UNIVERSITY OF WELLINGTON'S REQUEST FOR NO-ACTION LETTER FOR A SMALL-SCALE, NOT-FOR PROFIT, EVENT FUTURES MARKET FOR EDUCATIONAL PURPOSES</u>

**<u>Requester</u>:**

Victoria University of Wellington

Macdiarmid Building, Am404

Kelburn Parade

Wellington, 6012, New Zealand

Phone:

Dear Mr. McGonagle:

On behalf of Victoria University of Wellington, New Zealand ('Victoria University' or 'the University') I am writing to request a no-action letter from the Division of Market Oversight to permit the establishment and operation of a not-for profit, event futures market and offer event futures contracts to U.S. persons without registering as a designated contract market under Section 5 of the Commodity Exchange Act.

**<u>Proposal</u>**

Victoria University proposes the creation of a small-scale, not-for-profit, electronic real-money event futures market in the U.S. for educational and research purposes. The venture will be modelled

after the Iowa Electronic Market (IEM), which has operated for more than 20 years under two no-action letters from the CFTC.[1] The University intends to establish a subsidiary (to operate on a not-for-profit basis) in the U.S. for the project.

Certain changes are proposed to the IEM model. These changes are intended to insure that the system produces more accurate results and fulfills the educational public interest purpose of the project. As more specifically described below, we intend to accomplish this by offering upgraded technology that we consider more user- friendly, eliminating any upfront user fee, increasing the number of participants, raising the 1992 dollar limits to 2014 levels, employing Know-Your-Customer authentications to strengthen the integrity of the system, requiring that users be at least 18 years old, and facilitating ease of registration, deposits and withdrawals.

Given the important academic and educational benefit we hope to be derived from this research and the purposes and manner of operation of the proposed market, the University believes that the market will be a valuable academic tool and entirely consistent with the public interest. However, because the proposed contracts would be available to U.S. persons, we are concerned that, absent the relief requested in this letter, the operation of the proposed market without obtaining designation as a contract market would be prohibited by the Commodity Exchange Act (the "Act") and the regulations promulgated thereunder.[2] Accordingly, the University seeks confirmation from the Division that it will not recommend enforcement action against the University or its agents for operating the proposed market and offering event contracts without contract market designation.

**Description of the Market:**

Customized software will be used to operate a market-based political and economic forecasting system. The University's key employees overseeing the project will be three University professors and one administrator. Neither the professors nor the administrator will receive any compensation or other payment, directly or indirectly, for operating the markets. Neither Victoria University nor any of the key personnel operating the proposed markets is required to register with the Commission, nor is any of these persons or entities a business affiliate of any person required to register with the Commission.

The written and other descriptive materials concerning the Proposed Market will prominently disclose that this is an experimental, research-based market that is being operated for academic purposes, and is not regulated by, nor are its operators registered with, the Commodity Futures Trading Commission or any other regulatory authority.

**Educational Purposes and Uses of Market Information:**

The University proposes to utilize the results of the market information for educational and research uses and purposes, including: courses in statistical analysis, market theory, and trader psychology; and to publish related research papers and analyses. Like IEM, the results may be made available to other participating academic institutions for the same purposes.

**Examples of Contracts to be Offered**

*Political Event Contracts*. As with IEM, we hope the market will be open to users worldwide.[3]

Political Event Contracts will include the following:

---

[1] *See* http://www.cftc.gov/ucm/groups/public/@lrlettergeneral/documents/letter/92-04a.pdf and
http://www.cftc.gov/ucm/groups/public/@lrlettergeneral/documents/letter/93-66.pdf
[2] 7 U.S.C Sec. 1 *et seq.*, and Commission rules and regulations found at 17 C.F.R Part 34.
[3] *See* http://tippie.uiowa.edu/iem/faq.html#who ("The IEM is operated for research and teaching purposes. All interested participants world-wide can trade in our political markets.")

- Presidential Elections Submarket:
    - Winner-Take-All contracts to predict which presidential candidate will win their parties' primaries, the general election popular vote, and the Electoral College;
    - Winner-Take-All contracts to predict who will be the major party nominees for Vice President
    - A Vote Share contract to predict what percentage of the vote the two major party candidates will receive
- Congressional Control Submarket to predict which party will control the next Congress.
    - Congress 2014 contract-- based on the composition of both houses of Congress
    - House2014 contract -- based on the composition of the U.S. House of Representatives
    - Senate2014 contract -- based the composition of the U.S. Senate
- Other Significant U.S. Elections Submarket
    - Contracts to predict the outcome of other significant U.S. Elections not falling within the other markets
- International Elections Submarket
    - Contracts to predict the outcome of certain foreign elections, such as the Canadian elections described in the 1993 IEM no-action letter.

*Economic Indicator Contracts*

- Federal Reserve Monetary Policy Winner-Takes-All.
    - The Federal Reserve Monetary Policy Submarket B (FedPolicyB) is a real-money event contract. Contract payoffs are determined by monetary policy decisions of the Federal Open Market Committee regarding the federal funds target rate.

The market may list additional event-driven contracts based on significant Political Events. It may also list additional Economic Indicator Contracts. However no Economic Indicator Contracts shall compete with any contracts that are listed by a regulated contract market at the time of listing by the market and the market shall not list more than 5 Economic Indicator Contracts at any one time. Participation in Economic Indicator Contracts shall be limited to students, faculty and staff at any participating universities. The market will not list any contracts that involve, relate to or reference terrorism, assassination or war.

### Structure of Contracts

Shares are initially priced at $1. Contracts for the correct outcome pay off at $1. All other contracts pay off at zero. As a result, the price of the contract at any given time is the probability that the traders believe that event will happen. There will be no additional fees other than those necessary to cover the basic expenses of running the market, including the University's expected costs and those of any service providers as described herein. Participants will execute their own trades, and no brokerage service will be available or allowed. Participants will invest their own funds, buy and sell listed contracts, and bear the risk of loss.

### Know Your Customer Requirements

The University intends that an age and identity verification process be employed that will follow Know Your Customer Requirements ("KYC"). The KYC process, performed by an established and credible third party, is a critical and essential component of our proposed system, and a major difference from IEM's structure. KYC will be implemented to strengthen the overall integrity and stability of the system and to improve the accuracy of the results, by reducing the likelihood of fraud, market manipulation, use of the system by minors, and excessive amounts being deposited by individuals using multiple accounts. This process will be operated by a third party, Aristotle International, Inc., whose Integrity authentication service is a leading global provider of age and identity verifications for government and business, having successfully performed over 50 million authentications. Aristotle is also one of only 6

Federal Trade Commission-approved Safe Harbors for compliance with the Child Online Privacy Protection Act COPPA. A description of Aristotle and its Integrity Service can be found at http://integrity.aristotle.com/.

**Number of Traders in Each Market**

IEM is limited to 2000 total traders in any particular election. We propose raising the limit to 5000 total traders in any particular election.

As the purpose of the market is an academic and educational tool, restricting the number of participants too greatly is likely to result in a market that is not as close to an efficient and effective a prediction tool as it could be and therefore impacts the value of the academic research generated by the project.

Specifically, there is nothing in the way of academic or comparative study to justify or even suggest that IEM's limitation is needed to optimize the accuracy of the market. What is known is that there are compelling reasons to raise the limit on the number of traders participating in a market:

1. Prediction markets work because they aggregate information from "a group of traders, and groups are almost always smarter than the smartest people in them."[4]
2. Thinly-traded contracts give single users an outsized voice in the market, creating the potential for results that skew in one direction or the other.[5]
3. A limited trader base will restrict the number and nature of prediction questions, as there will be too small a trading base for specialized questions or regional questions. Prediction questions with few participants are illiquid and have limited appeal to participants. Greater market liquidity is linked to market accuracy. Without liquidity there is less incentive to trade and therefore less information sources available to the market. In our experience this concentrates trading into a small number of prediction stocks and limits the market scope.
4. Limiting participant numbers limits informational sources for the market. The purpose of the market is to bring into the public domain private information. Prediction markets are successful because they are informationally efficient. Restrictions on participation may lead to the market not factoring in some available information, directly reducing accuracy.

---

[4] *See* http://www.utsandiego.com/news/2010/feb/01/1c01prediction/ quoting James Surowiecki in his 2004 book, "The Wisdom of Crowds".

[5] *See, e.g.,* **Betting on a future market,** http://www.nbcnews.com/science/betting-future-market-6C10405016?franchiseSlug=sciencemain; *See also,* Betting on Politics--and Getting it Right, CNN November 16, 2011 http://tippie.uiowa.edu/iem/media/story.cfm?ID=2718 :

> "Many of the markets are thin, and that's a problem," Fair said….Thinly traded contracts give single users an outsized voice in the market, creating the potential for results that skew in one direction or the other. And around the margins—when a candidate stands very little chance of winning, or has already locked up the race—the market becomes far less perfect," Fair said.

*See also,* **Prediction Markets Are Hot, But Here's Why They Can Be So Wrong** (May 19, 2008) Wired Magazine, http://archive.is/eZ0E5#selection-1877.9-1877.691 :

> Like financial markets, prediction markets are big information processors, distilling the collective wisdom of their traders. But the success of any market depends upon the stakes and the pool of traders. Most prediction markets aren't anywhere near as robust as those they emulate on Wall Street. "They are thin, trading volumes are anemic, and the dollar amounts at risk are pitifully small," market analyst Barry Ritholtz wrote in January. That opens them up to all kinds of problems as information processors. Political markets, for example, have a lot of political junkies but few real insiders or outsiders, so they're not very good at catching something the polls might miss.

5. When there is too small a cap as with IEM, people who sign up, but who do not participate or who participate very infrequently, are effectively blocking legitimate participants who could better help the market to realize its beneficial educational purpose.

6. Although IEM has frequently been praised for beating the polls a large percentage of the time, this does not mean that the IEM market is as accurate as it could be, or that IEM is beating the polls as often and by as large a margin as it could.

7. In a letter written by 22 professors who are experts in prediction markets (including those professors who operate IEM), although a "modest" annual cap on deposits by an individual was proposed, they specifically did not propose a limit on the number of participants.[6]

8. Limiting the maximum number of traders too severely can greatly limit the ability to add additional sponsoring universities, a consequence that severely undercuts the educational reach and purpose of the market.

9. We do not anticipate that more than a few thousand traders will participate in any particular election, other than for U.S. President. We expect that the level of public interest in a particular contract will in fact be the strongest and most natural limiting factor. However, where there is a particularly significant event contract in which many thousands more would want to participate, then rejecting those participants would utterly defeat the educational purpose of the project.

We therefore propose that the number of traders in any particular election be increased to 5000. We are of the strong opinion that greater limits on participants will significantly undermine the academic utility of the project. We anticipate that the higher cap proposed, coupled with a slightly higher maximum deposit limit (discussed below), will make the proposed markets more efficient by minimizing the likelihood of thinly-traded contracts, while preserving the small-dollar, educational purpose of the project, similar to IEM.

**Markets Open to Non-Academic Traders**

We also propose that Political Event Contracts not be limited to a fixed minimum percentage of "academic traders", such as the students and staff of educational institutions. There is nothing to suggest that any such limit used by IEM is in any way related to the educational purpose or the accuracy of the market, or has been justified by any comparative studies. Many of the same reasons stated above for expanding the number of traders would also logically apply to this issue as well.

There is simply no reason to believe a fixed minimum of academic participants will help with educational and research purposes of the market. In fact this is likely to bias the markets and reduce access to a broader range of informational sources therefore reducing accuracy. The primary educational and research purposes of the market rely on the market being informationally efficient and accurate. We also foresee a number of questions that will provide useful information for researchers, in which questions one would not want a quota for academic participation especially where the public debate is already led or heavily influenced by academics.

---

[6] *See* **The Promise of Prediction Markets.**, Science 16 May 2008, http://www.sciencemag.org/content/320/5878/877.full .
*See also*, **Betting on a future market**, NBC News, Science, http://www.nbcnews.com/science/betting-future-market-6C10405016?franchiseSlug=sciencemain . The Researchers making this request, and their affiliations at the time, were: Kenneth J. Arrow, Paul Milgrom and Erik Snowberg of Stanford University; Robert Forsythe of the University of South Florida; Michael Gorham of the Illinois Institute of Technology; Robert Hahn of the American Enterprise Institute; Robin Hanson of George Mason University; John O. Ledyard of the California Institute of Technology; Saul Levmore and Cass R. Sunstein of the University of Chicago Law School; Robert Litan of the Kauffman Foundation; Forrest D. Nelson and George R. Neumann of the University of Iowa; Marco Ottaviani of Northwestern University; Thomas C. Schelling of the University of Maryland at College Park; Robert J. Shiller and Paul C. Tetlock of Yale University; Vernon L. Smith, Philip E. Tetlock and Hal R. Varian of the University of California at Berkeley; Justin Wolfers of the University of Pennsylvania; and Eric Zitzewitz of Dartmouth College

### Amount of Trader Investment

Under the 1992 and 1993 no-action letters addressing the original IEM proposals[7], the "maximum investment by any single participant in any one Submarket is $500." IEM continues to use that limit. However, using the Consumer Price Index, $500 in 1992 had the same buying power as $844.99 in 2014[8]. Therefore, we propose raising the limit to $850, to allow participants the ability to participate in several more contracts than they might otherwise if limited to 1992 levels. This will make the proposed markets more efficient by minimizing the likelihood of thinly-traded contracts, while preserving the small-dollar, research and academic purpose aspects of the IEM. This $850 limit also compares favorably with the $2000 annual investment limit recommended by 22 researchers (including two of the IEM's co-founders) in their 2008 request to Congress and the CFTC to clear up uncertainty in the regulation of prediction markets.[9]

### Methods of Registration

The system will be employed to allow electronic registration to facilitate trader participation, while simultaneously safeguarding against duplicate or multiple accounts for the same user, or registration by minors. These registrations will be verified and authenticated through the KYC process to be provided by Aristotle's Integrity, and can take place in real-time.

### Methods of Deposit/Withdrawal

Complementing the efficiency of electronic registration, and to otherwise make the proposed market system easier to use, the system will allow credit card deposits and withdrawals for those authenticated through the Integrity KYC process. Those transactions will be processed through Aristotle, which has years of experience handling such transactions. For example, Aristotle's Integrity service has processed over 50 million authentications using a database of government-issued ID and other government records. Aristotle also is an experienced processor, well versed in regulatory reporting and compliance, having handled millions of dollars in campaign contributions over the years for hundreds of candidates and political action committees through its service at www.campaigncontribution.com .

### User Fees/Covering Costs

Neither the University nor its key personnel operating the market will receive any compensation or other payment for operating it. The pricing for the project will be set to cover anticipated regulatory compliance and operating costs. At this time, it is projected that, unlike IEM, the market terms will not require any upfront charge or fee. The only user fees will be those designed to cover for costs of credit card processing of deposits and withdrawals, fulfillment of the KYC process, and all other regulatory compliance and operating costs.

### Marketing

We understand that one aspect of the IEM, as spelled out in the no-action letters, was that no one involved in the operation could engage in any "advertising" of the IEM. However, the IEM market would be less efficient, and therefore less valuable from a research standpoint, if the markets draw an inadequate pool of participants as a result of the marketing restrictions. It is the University's view that, in order to reach a pool of widely dispersed but interested political users, one must do limited advertisement to attract sufficient and diverse users to the market. The University believes that the reason that significant research based upon the data derived from prediction markets has been limited is due to a failure to reach a wider audience. Moreover, although IEM may not do "advertising", it does

---

[7] *See* http://www.cftc.gov/files/foia/repfoia/foirf0503b002.pdf
[8] *See,* e.g., http://www.dollartimes.com/calculators/inflation.htm
[9] *See* n. 7, *supra.*

appear that it engages in promotional activity such as press releases[10] and links to earned media[11]. In short, we believe that the limitations on the modest amounts to be invested, together with efficient KYC controls to prevent multiple accounts and participation by minors, will be sufficient to preserve the non-commercial nature of the proposed markets without prohibiting limited efforts to publicize our activities. Any such promotional activities would contain a disclosure that the market is unregulated, and would be limited by targeting only media outlets where there is a high likelihood of reaching those interested in the subject matter of the contracts at hand. Promotional activity would not be directed at the general retail investing public.

### Experimental Nature of Prediction Markets

Finally, as noted above, although IEM is reported to perform generally better than polls, this does not mean that the structure developed for IEM in the late 1980's, and approved by the CFTC in the 1992 and 1993 no-action letters, is optimal for an educational market. As the 22 leading academics wrote in their 2008 letter to the CFTC:

> The CFTC should allow researchers to experiment with several aspects of prediction markets—fee structures, incentives against manipulation, liquidity requirements and the like—with the goal of improving their design. Prediction markets are in an early stage, and if their promise is to be realized, researchers should be given flexibility to learn what kinds of design are most likely to produce accurate predictions. Of course, exchanges would need to inform their customers so that they are aware of the risks and benefits of participating in these markets.

Given that the market we propose is a small-money market, and has far greater safeguards than IEM to preserve the integrity of the operation, we believe that the design we have proposed will be in the public interest.

If you have any questions or require additional information, please do not hesitate to contact the undersigned.

Respectfully submitted,

Victoria University of Wellington

By: _____

Neil Quigley
Deputy Vice-Chancellor, Research

---

[10] *See, e.g.,* http://tippie.uiowa.edu/iem/media/releases.cfm
[11] *See, e.g.,* http://tippie.uiowa.edu/iem/media/news_current.cfm

# Exhibit 2



**U.S. COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
Telephone: (202) 418-5260
Facsimile: (202) 418-5527

Division of
Market Oversight

CFTC Letter No. 14-130
No-Action
October 29, 2014
Division of Market Oversight

Neil Quigley
Deputy Vice-Chancellor, Research
Victoria University of Wellington
Macdiarmid Building, Am404
Kelburn Parade
Wellington, 6012, New Zealand

> Re:   Victoria University of Wellington's Request for No-Action Letter regarding the
>       Operation of a Small-Scale, Not-For-Profit Market for the Trading of Event
>       Contracts for Educational Purposes

Dear Mr. Quigley:

This letter is in response to your letter to the Division of Market Oversight ("DMO" or "Division") of the Commodity Futures Trading Commission ("CFTC" or "Commission") dated August 26, 2014, requesting no-action relief that would allow Victoria University of Wellington, New Zealand ("Victoria University")[1] to operate a not-for-profit market for the trading of event contracts and the offering of such event contracts to U.S. persons.

As you note in your letter, the Division of Trading and Markets ("T&M"), which preceded DMO as the CFTC division with oversight responsibilities for regulated markets, granted no-action relief by letter dated June 18, 1993, to the University of Iowa to permit the operation of a non-profit electronic market ("Iowa Electronic Markets" or "IEM").[2]  The IEM consists of submarkets for binary contracts concerning political elections and economic indicators — it is operated for academic research purposes only, and its operators, who are faculty at the University, receive no separate compensation.

---

[1] Victoria University was founded as Victoria College in 1897.  The University comprises four campuses, more than 2,000 staff and 16,000 students.  Additional information about the University's history, faculty, academic offerings, reputation, rankings, and related matters is available at http://www.victoria.ac.nz/about/.

[2] CFTC No-Action Letter No. 93-66 (June 18, 1993), *available at* http://www.cftc.gov/ucm/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

**18**

Victoria University proposes the creation of a small-scale, not-for-profit, online market for event contracts in the U.S. for educational purposes that will use the IEM as a model, with certain features that would vary from that model. As such, you request on behalf of Victoria University similar no-action relief with respect to the operation of your proposed market for event contracts as was granted to the University of Iowa with respect to operation of the IEM. In particular, you request that DMO recognize that Victoria University's market for event contracts, as proposed, should not be required to register as a designated contract market ("DCM") under section 5 of the Commodity Exchange Act ("CEA") and part 38 of the Commission's regulations, nor as a foreign board of trade ("FBOT") under section 4 of the CEA and part 48 of the Commission's regulations, and that its operators need not register under the CEA or the Commission's regulations.

## I. Background

Based upon the representations contained in your letter, as supplemented by telephone conversations with DMO staff, we understand the facts to be as follows. Victoria University (henceforth "University") intends to operate two submarkets: one for political event contracts, and the other for economic indicator contracts. The University proposes to utilize the results of the market information derived from trading in these contracts for educational and research purposes. For example, the University plans to utilize the results from its market as teaching tools in its courses on statistical analysis, market theory, and trader psychology. The University has also expressed plans to utilize the results to publish related research papers and analyses.

All of the proposed event contracts would be structured as follows:
- all contracts would be initially priced at $1;
- each contract for the correct outcome would pay off at $1, while all other contracts (i.e., contracts with incorrect outcomes) would not pay-off; and
- the price of each contract at any given time would reflect the probability that the traders believe that the event will happen.

The proposed submarket for political event contracts will include winner-take-all contracts to predict the following outcomes:
- which presidential nominee will win his or her party's primary, the general election popular vote, and the Electoral College;
- who will be the major party nominees for Vice President; and
- which party will control the next Congress.

The proposed submarket for economic indicator contracts will include winner-take-all contracts to predict monetary policy decisions of the Federal Open Market Committee regarding the federal funds target rate. The University represents that it will not list any economic indicator contract that would compete with any contract that is listed by a CFTC-regulated contract market, and the University would not list more than five economic indicator contracts at any one

time.  Participation in the submarket for economic indicator contracts would be limited to students, faculty and staff at any participating universities.[3]

By design, the University's model for its proposed market for event contracts bears many close similarities to the IEM model, including the following items:

- The University's key employees overseeing the project will be three University professors and one administrator.
- Neither the professors nor the administrator will receive any compensation or other payment, directly or indirectly, for operating the market.
- Neither the University nor any of the key personnel operating the proposed market is required to register with the Commission, nor is any of these persons or entities a business affiliate of any person required to register with the Commission.
- There will be no additional fees other than those necessary to cover the basic expenses of running the market, including the cost of credit card processing of deposits and withdrawals, fulfillment of the know-your-customer ("KYC") process,[4] and all other associated regulatory compliance and operating costs.
- Participants will execute their own trades, no brokerage service will be available or allowed, and no commissions will be charged.

However, the University's proposed market for event contracts would feature certain aspects that would distinguish it from the IEM model.  The following four departures from the IEM model, you argue, would cause the University's market for event contracts to produce more accurate results, thereby furthering the educational public interest purpose of the project, by permitting:

    (1) a larger allowable number of traders in each contract;
    (2) a larger number of traders that are not affiliated with the University to trade political event contracts;
    (3) a larger allowable investment by any single market participant; and
    (4) a limited level of advertising.

## 1. Number of traders in each contract

Participation in IEM is limited to 2000 total traders in any particular election for which a political market is operated, and to 1000 total trades in any particular economic indicator submarket.  The University proposes to have a limit of 5000 total traders in any particular contract, explaining that broader participation would make these contracts more efficient and effective prediction tools. The University anticipates that the higher proposed cap on participation, coupled with a higher maximum deposit limit (discussed below), would together

---

[3] The University represents that several U.S. universities have indicated a willingness to participate in the University's market for event contracts.  Thus far, the University has neither sought nor obtained firm commitments from any of the universities contacted and does not intend to do so until it obtains the necessary relief from Commission staff.  Such participation by other universities, as planned, would be similar to the participation by several universities in the IEM that the University of Iowa has been able to obtain.

[4] The University represents that it will implement an age and identity verification system as part of a KYC process, performed by an outside independent party: Aristotle International, Inc.

increase the value of the academic research generated by the project by reducing the likelihood of thinly-traded contracts. Thinly-traded contracts, the University explains, would likely allow individual users to have an outsized impact on contracts, thereby creating the potential for artificially skewed results and undermining the academic utility of the project.

## 2. Access to submarket for political event contracts

IEM limits participation in its political submarket to primarily students, faculty and staff at participating universities, and restricts participation in its economic indicator submarket to only such "academic traders." While the University proposes that participation in its economic indicator submarket be restricted to only academic traders at participating universities, the University has also proposed that trading in its political submarket not be limited to primarily academic traders. In support of its proposal, the University posits that many of the same reasons stated above for expanding the maximum number of allowable traders would also logically apply to this issue — a reduced number of traders would bias the market and reduce access to a broader range of informational sources, thereby reducing accuracy and academic utility.

## 3. Larger allowable investment by any single market participant

IEM limits the maximum investment by any single participant in any particular contract to $500. The University proposes raising the limit on investment by any single participant in any particular contract to $850. The University represents that, using the Consumer Price Index, $500 in 1992 (the year in which the Division first granted no-action relief to the University of Iowa) had the same buying power as $844.99 in 2014. The University explains that increasing the maximum allowable investment would allow participants the ability to participate in several more contracts than they might otherwise if limited to 1992 dollar levels. This, the University explains, would make its market more efficient by minimizing the likelihood of thinly-traded contracts, while still adhering to the small-dollar, educational purpose of the IEM model.

## 4. Advertising would be permitted

In its 1993 relief request, IEM represented that none of its operators, nor any other person involved with the IEM, engages in any advertising concerning the IEM. The University proposes to engage in limited advertisement of its market in media outlets where there is a high likelihood of reaching those interested in the subject matter of its contracts. Any such advertisements would prominently disclose that the proposed market is unregulated, experimental, and being operated for academic purposes. It is the University's view that limited advertisement is necessary to attract sufficient and diverse users to its proposed market.

The University represents that it will use little, if any, paid advertisements to market its contracts. Instead, the University would attract participants through channels of communication within the academic community, including word-of-mouth marketing, articles and interviews with media.

DMO notes that the University's proposed political event contracts can be distinguished from the North American Derivatives Exchange's ("Nadex") political event contracts that were

4

disapproved by Commission Order on April 2, 2012.[5]  Specifically, the University's request for no-action relief was not in any way premised upon claims that its proposed event contracts have any hedging or price-basing utility.  Much to the contrary, the University's proposed market for event contracts represents an academic exercise demonstrating the information gathering and predictive capabilities of markets.  Another important distinction is that the University's proposed market would operate on a non-profit basis.  Furthermore, because participation levels and maximum allowable investments in the University's proposed contracts would each be capped at very low levels, the University's proposed political event contracts would not have the same potential for compromising the integrity of elections as would Nadex's disapproved political event contracts, which were much larger.

## II. Scope of no-action relief provided by DMO

Based upon your representations concerning the purposes and manner of operation of your proposed market for event contracts, the Division does not believe that operation of this proposed market without registration as a DCM, FBOT, or swap execution facility ("SEF"),[6] or without registration of its operators, would be contrary to the public interest.  The Division's conclusion is based upon the facts that, among others, your proposed market for event contracts has been designed to serve academic purposes and the operators will receive no compensation.  Furthermore, the Division would allow the University's four proposed variations from the IEM model, as discussed above, because each is intended to produce more accurate results, which would promote the educational public interest purpose of the project while maintaining the small-scale, not-for profit nature of the proposed market.

Consequently, based upon your representations, DMO will not recommend that the Commission take any enforcement action in connection with the operation of your proposed market for event contracts based upon the operators' not seeking designation as a contract market, registering under the Act or otherwise complying with the Act or Commission regulations.

DMO does not render any opinion as to whether the operation of your proposed market for event contracts violates any state law provisions, nor does the Division's position excuse non-compliance with any such law.

This letter is based upon the information that has been provided to the Division and is subject to the conditions stated above.  Any different, changed or omitted material facts or circumstances may render this no-action relief void.

This letter, and the no-action position taken herein, represents the views of DMO only, and does not necessarily represent the positions or views of the Commission or of any other division or

---

[5] *Order Prohibiting the Listing or Trading of Political Event Contracts* (April 2, 2012), *available at* http://www.cftc.gov/ucm/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf.   The disapproved Nadex contracts were binary option contracts that would have paid out based upon the results of various U.S. federal elections in 2012.

[6] DMO staff believes that the proposed event contracts could be characterized as swaps pursuant to CEA section 1a(47)(A)(ii).  In general, no person may operate a facility for the trading or processing of swaps unless the facility is registered as a SEF or as a DCM.  *See* CEA section 5h(a)(1).

office of the Commission.  As with all no-action letters, DMO retains the authority to condition further, modify, suspend, terminate or otherwise restrict the terms of the no-action relief provided herein, in its discretion.

If you have any questions concerning this correspondence, please contact David Van Wagner, Chief Counsel, Division of Market Oversight, at (202) 418-5481 or dvanwagner@cftc.gov, or David Pepper, Attorney Advisor, Division of Market Oversight, at (202) 418-5565 or dpepper@cftc.gov.

Sincerely,

_____

Vincent McGonagle
Director, Division of Market Oversight

# Exhibit 3

Case 1:22-cv-01909-JDB Document 1-10 Filed 01/03/2025 Page 60 of 119



**U.S. COMMODITY FUTURES TRADING COMMISSION**

Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
Telephone: (202) 418-5000

Division of
Market Oversight

Vincent McGonagle
Director

Professor Margaret Hyland, Ph.D.
Vice-Provost (Research)
Vice Chancellor's Office
Victoria University of Wellington
HU 207, Hunter Building, Gate 1
Kelburn Parade, Kelburn
Wellington 6012, New Zealand

**Re: Withdrawal of CFTC Letter No. 14-130**

Dear Dr. Hyland:

As you are aware, on October 29, 2014, the Division of Market Oversight ("DMO" or "Division") of the Commodity Futures Trading Commission ("CFTC" or "Commission") issued CFTC Letter No. 14-130 ("Letter 14-130" or "Letter") granting the request of Victoria University of Wellington, New Zealand ("the University") that the Division not recommend enforcement action (*i.e.*, "no-action" relief) against the University in connection with its operation of an online, not-for-profit, event contract market in the U.S. for educational and research purposes, without registration as a designated contract market, swap execution facility, or foreign board of trade, and without registration of its operators, subject to certain terms outlined in the Letter.[1]

According to the terms of the Letter, DMO granted the relief based upon the representations of the University that the proposed event contract market would:

(1) be small-scale and not-for-profit;
(2) be operated for academic and research purposes only;
(3) be overseen by faculty at the University, without receipt of separate compensation;
(4) offer event contracts consisting of two submarkets for binary option contracts concerning political election outcomes and economic indicators;

---

[1] Letter 14-130, https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/14-130.pdf.

**25**

(5) be limited to 5,000 traders per contract, with an $850 investment limit per participant in any contract;

(6) not offer brokerage services or charge commissions to participants;

(7) utilize a third-party service provider to perform know-your-customer ("KYC") due diligence on its participants[2];

(8) only charge those fees necessary to cover the fulfilment of the KYC process, regulatory compliance, and basic expenses to operate the proposed event contract market; and

(9) limit advertising to media outlets where there is a high likelihood of reaching those interested in the subject matter of its event contracts, provided that such advertising prominently discloses that the platform is unregulated, experimental, and being operated for academic purposes.[3]

The University has not operated its market in compliance with the terms of Letter 14-130.[4] As a result, Letter 14-130 is hereby withdrawn and, as such, is not available for the listing or operation of any new or related contracts. To the extent that the University is operating any contract market, as of the date of this letter, in a manner consistent with each of the terms and conditions provided in Letter 14-130, all of those related and remaining listed contracts and positions comprising all associated open interest in such market should be closed out and/or liquidated no later than 11:59 p.m. eastern on February 15, 2023.

Should you have any questions, please do not hesitate to contact Brigitte Weyls, Assistant Chief Counsel, Division of Market Oversight, bweyls@cftc.gov or 312-596-0547, or Rachel Kaplan Reicher, Senior Special Counsel to the Director, Division of Market Oversight, rreicher@cftc.gov or 202-418-6233.

Sincerely,

_____

Vincent McGonagle
Director
Division of Market Oversight

---

[2] *Id*. at 3.

[3] *Id*.

[4] In Letter 14-130, DMO stated that it "retains the authority to condition further, modify, suspend, terminate, or otherwise restrict the terms of the no-action relief provided herein, in its discretion." *See id*. at 6.

2

Case: 22-51124   Document: 6   Page: 62   Date Filed: 01/03/2023

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| KEVIN CLARKE, in his individual capacity, TREVOR BOECKMANN, in his individual capacity, HARRY CRANE, in his individual capacity, CORWIN SMIDT, in his individual capacity, PREDICT IT, INC., a Delaware corporation, and ARISTOTLE INTERNATIONAL, INC., a Delaware corporation, | Case No. 1:22-cv-00909 |
| Plaintiffs, | |
| v. | |
| COMMODITY FUTURES TRADING COMMISSION, | |
| Defendant. | |

### DECLARATION OF KEVIN A. CLARKE

Pursuant to 28 U.S.C. § 1746, I, Kevin A. Clarke, do hereby declare:

1.      My name is Kevin A. Clarke.  I am a resident of Austin, Texas, where I am the owner of Clarke Mineral Estate and Geosciences, LLC, an Assistant Coach for the University of Texas at Austin's Policy Debate Team. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I have personal knowledge of the facts stated herein.

3.      I have traded on the PredictIt Market for two years.  At the time I began trading on the PredictIt Market, I investigated the Market's operations and discovered that the Market is operated pursuant to CFTC Letter No. 14-130 (the "No-Action Relief"), which I understand permitted the PredictIt Market to operate without formally registering as an exchange with the

CFTC. Knowing that the CFTC had signed off on the PredictIt Market's operations assured me of the security of my investments on the Market.

4.    I currently have approximately $11,000 invested in all 85 contract markets currently hosted on the PredictIt Market. Of those markets, approximately 14% of them will not settle on or before February 15, 2023.

5.    Based on my research and experience investing in political event contracts, I believe that my contracts predict the correct outcome of the political events to which they relate.

6.    I am aware that the CFTC revoked the No-Action Relief in CFTC Letter 22-08, entitled "Withdrawal of CFTC Letter No. 14-130" (the "Revocation"). The Revocation has had a direct and immediate impact on the value of PredictIt Market event contracts.

7.    Experienced PredictIt traders tend to purchase event contracts far in advance of the deciding event when the contracts' values are relatively low due to outcome uncertainty based on the event's remoteness. Only when the deciding event grows closer in time do those event contracts appreciate. Accordingly, the further in advance a trader purchases an event contract, the greater his financial gain is likely to be when he sells the contract at an appreciated value or the event closes in his favor. Using this strategy, I have made investments in event contracts predicting the outcome of the 2024 presidential election that I expect to appreciate significantly if allowed to run their course. These contracts will not settle before the February 15, 2023, when the CFTC has ordered that all outstanding PredictIt Market contracts be liquidated. Because of the CFTC's decision, forcing the early liquidation of my contracts, I will lose the opportunity to see these contracts to the end and the gains I anticipate in doing so, or in trading those contracts away at advantageous prices before their maturation.

8.     I know of no rationale for why the CFTC has chosen February 15, 2023, as the cutoff date for the PredictIt Market's operations. But the imposition of this seemingly arbitrary date has significantly distorted the current and prospective value of 2024 election contracts because trades are now attempting to salvage their investments based on factors other than the correct outcome of the 2024 presidential election. As a result, I am feeling the effects of the revocation right now, as the market is not working efficiently, is distorted, and I cannot trade the contracts with others attempt the predict *what the outcome of the contract will be* as opposed as to some effort to just get what they can from a difficult situation created by the CFTC.

9.     Based on what I know about the markets, if the CFTC is enjoined from requiring contracts to end prematurely in February 2023 and the contracts are allowed to run their natural course, the most significant distortions in the Market should end, as participants resume attempting to predict the post-February 2023 outcome of the event on which the contract turns. Active traders can then resume selling their contracts at times where they believe the price overstates the probability of the outcome and buying when they believe the price understates the probability of the outcome.

10.     Not only am I a Market participant, I am also informed consumer of the data the Market provides in terms of projecting the outcome of elections and other significant political events. I have great faith in the superior accuracy of PredictIt Market pricing in making political projections over polls and punditry. This confidence comes from what I observe of other traders in the community, who participate in online communities to discuss the reasoning behind their positions. Because of the modest financial investments in stake, I analyze, and I see other traders analyzing, up-to-the-date developments that will affect the outcome, doing incisive research on legal outcomes or effects of similar events in previous elections. What I rarely see is passionate

argument driven by bias or preference for an outcome, which can affect other forms of political projection. With the CFTC's crash-out date of February 2023, the data produced by the PredictIt Market is being stripped of its value for these longer-term contracts, with no immediately available replacement. The data created by the Market was of great interest and value to me as an observer of politics and, frankly, as a citizen acutely interested in the outcome of elections and other significant political events.

11.    The Revocation has also disrupted contract markets based on events that will occur before February 15, 2023, because it provides no certainty regarding which contract markets may continue to operate until February 15, 2023, and which must liquidate immediately due to noncompliance with the terms and conditions of the No-Action Relief decision. This uncertainty has led many traders to attempt to pull their money out of the Market immediately even if they could otherwise have profited from their contract investments. This withdrawal from the Market effects remaining traders' ability to sell appreciated contracts that they no longer believe predict the correct event outcome.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9/27/2022

_____
Kevin A. Clarke

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| KEVIN CLARKE, in his individual capacity, TREVOR BOECKMANN, in his individual capacity, HARRY CRANE, in his individual capacity, CORWIN SMIDT, in his individual capacity, PREDICT IT, INC., a Delaware corporation, and ARISTOTLE INTERNATIONAL, INC., a Delaware corporation, | Case No. 2022-cv-00909 |
| Plaintiffs, | |
| v. | |
| COMMODITY FUTURES TRADING COMMISSION, | |
| Defendant. | |

## DECLARATION OF HARRY CRANE

Pursuant to 28 U.S.C. § 1746, I, Harry Crane, do hereby declare:

1.      My name is Harry Crane.  I am a statistics professor at Rutgers University and a fellow at the London Mathematical Institute.  I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I have personal knowledge of the facts stated in this declaration.

3.      I have used the PredictIt Market and the data it generates in my teaching and research.

4.      In my research, I have used PredictIt Market data to analyze the reliability of various methods for forecasting future political outcomes.  My analysis of PredictIt Market data generated between 2018 and 2020 suggests that the Market's percentage-trading price provides a more accurate prediction of election outcomes than analytics-based forecasts on the website

FiveThirtyEight.  *See*, *e.g.*, Harry Crane and Darion Vinson, *Models v. Markets: Forecasting the 2020 U.S. Election*, RESEARCHERS.ONE (Jan. 3, 2021) (attached hereto as Exhibit 1).   In general, I have concluded that the PredictIt Market is a reliable resource for gaining insight into future election outcomes. In particular, the PredictIt Market is especially valuable for quantifying the impact of specific events (*e.g.*, poll releases or news stories) on the probabilities of particular outcomes.  As such, they are a valuable source of real-time information about the status of a race.

5.      The PredictIt Market serves as a valuable check on accusations of media bias, poll manipulation, and election interference. The PredictIt Market helps bring nuance to such concerns.  Shutting down the PredictIt Market will thus remove this resource, which is very much in the public interest.

6.      I do not agree with some critics who claim the PredictIt Market is ripe for manipulation and profiteering.  My research has found no evidence of such manipulation.  Until evidence of such manipulation can be concretely provided, any such claim is mere speculation.

7.      I have also used the PredictIt Market in my undergraduate course, Statistics, Science, and Society, for honors undergraduate students.  The goal of the course is to teach students to think quantitatively about reporting and real-world occurrences.  PredictIt is a valuable resource for demonstrating the discrepancy between trader opinion and media reports.

8.      I understand that the CFTC has revoked CFTC Letter No. 14-130, which allowed the PredictIt Market to operate without complying with certain laws and CFTC regulations that are potentially applicable to the Market.  In effect, I understand that all contracts must be closed or liquidated by February 15, 2023.

9.      As a researcher, the 2024 election markets would be of principal interest. However, the CFTC requirement that contract markets are closed by February 15, 2023 distorts

these markets, as trading behavior is now adversely impacted by traders who are liquidating positions due to the influx of uncertainty over the CFTC action.

10.     The PredictIt Market's closure will negatively impact the academic community from both a research and pedagogical perspective.  If not for the Market's closure, I plan to continue to use the PredictIt Market and its data in my teaching and research.


Executed on September 27, 2022          _/s/ Harry Crane_____
                                        Harry Crane

**33**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| KEVIN CLARKE, in his individual capacity, TREVOR BOECKMANN, in his individual capacity, HARRY CRANE, in his individual capacity, CORWIN SMIDT, in his individual capacity, PREDICT IT, INC., a Delaware corporation, and ARISTOTLE INTERNATIONAL, INC., a Delaware corporation, | Case No. 2022-cv-00909 |
| Plaintiffs, | |
| v. | |
| COMMODITY FUTURES TRADING COMMISSION, | |
| Defendant. | |

## <u>DECLARATION OF CORWIN SMIDT</u>

Pursuant to 28 U.S.C. § 1746, I, Corwin Smidt, do hereby declare:

1.      My name is Corwin Smidt. I am a resident of Michigan, where I am an Associate Professor in the Department of Political Science at Michigan State University. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I have personal knowledge of the facts stated herein.

3.      The PredictIt Market has provided trading data free of charge to the academic community since its inception.

4.      I have used the PredictIt Market and the data it generates in my research on the reliability of public expectations as an indicator of future political outcomes and intended to use PredictIt data again in my future research.

34

5.     I understand that the CFTC has revoked the No-Action Letter under which the PredictIt Market operated and has ordered that the Market close or liquidate all contracts on or before February 15, 2022.  These would include certain contracts regarding the outcome of the 2024 presidential elections that I plan to study.

6.     The agency's decision renders trade/pricing data on event contracts that will not close before February 15, 2022 valueless to my research plans.  What assists my research is the behavior of market traders trying to accurate predict the outcome of an election or other political event, backed by a small investment that will reduce the risk of personal biases affecting that prediction.  I am studying whether the effect of backing a prediction with a small investment affects accuracy and how a liquid market attempting to predict the outcome of an election reacts to certain material events, such as revelations about a candidate or geopolitical developments.

7.     The agency announcement is causing traders now to shift from predicting the correct political outcome to salvaging their investment leading up to February 15, 2022.  This understandable market behavior is rendering the PredictIt data useless for my research plans.

8.     Though other political event-contract markets exist or have existed in the past, the PredictIt Market has been a particularly valuable data resource because it offers event contracts further in advance of the events they predict than other markets.  This gives researchers, like myself, the opportunity to analyze the public's changing attitudes toward political outcomes based on a variety of factors that unfold well in advance of the event on which the contracts are based.

9.     Additionally, various political-event markets have operated at various points in time and within slightly different parameters, it is difficult to compare data generated between markets with different rules and different cohorts of traders.  The distortion in the PredictIt

**35**

Market created by the agency's decision will significantly reduce the value of previous research using PredictIt data, as it will be difficult to compare those results to data created by a Market operating under the same rules in future election cycles. The markets varied parameters may produce inconsistent results from one market to the next where as taking data generated by one market under stable parameters over a long period of time would be far more reliable.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2022 _____

Corwin Smidt

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

OCT 6 2022

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

| | | |
|---|---|---|
| KEVIN CLARKE; TREVOR BOECKMANN; HARRY CRANE; CORWIN SMIDT; PREDICT IT, INC.; AND ARISTOTLE INTERNATIONAL, INC., | § § § § § | |
| PLAINTIFFS, | § § | CAUSE NO. 1:22-CV-909-LY |
| V. | § § | |
| COMMODITY FUTURES TRADING COMMISSION, | § § | |
| DEFENDANT. | § | |

## **ORDER**

**IT IS HEREBY ORDERED** that Defendant CFTC's Opposed Motion to Transfer Venue filed September 20, 2022 (Doc. #8) and Plaintiffs' Memorandum in Opposition to Motion to Transfer Venue filed October 4, 2022 (Doc. #13) are **REFERRED** to United States Magistrate Mark Lane for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, as amended.

SIGNED this _____**6th**_____ day of October, 2022.

_____
LEE YEAKEL
UNITED STATES DISTRICT JUDGE

**37**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

KEVIN CLARKE et al.,

                Plaintiffs,

    v.

COMMODITY FUTURES TRADING
COMMISSION,

           Defendant.

Case No. 1:22-cv-00909

The Honorable Lee Yeakel

**HEARING REQUESTED**

## PLAINTIFFS' REPLY IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
T: (202) 778-2204
medney@huntonak.com

John J. Byron
STEPTOE & JOHNSON LLP
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
T: (312) 577-1300 / F: (312) 577-1370
jbyron@steptoe.com

*Attorneys for Plaintiffs*

38

## INTRODUCTION

On August 4, 2022, the CFTC ordered the PredictIt Market to close and specified exactly how and by when it must do so. Most dramatically, the CFTC mandated that PredictIt prematurely liquidate millions of shares in political event contracts, held by private traders, by 11:59 PM on February 15, 2023. These contracts largely turn on the outcomes of elections that occur in 2024, most prominently the U.S. presidential elections. The lead Plaintiffs in this matter invested in these contracts in reliance on the CFTC having permitted the PredictIt Market to be established and the fact that the CFTC, in turn, could not terminate contracts trading in the Market without an explanation. The requested preliminary injunction is *narrowly targeted* against the enforcement of the CFTC's command that all contracts of any kind must end on February 15, no matter what.

No explanation—much less one amounting to the reasoned decisionmaking required by the Administrative Procedure Act ("APA")—has been provided for why the CFTC will not permit these contracts to run their course until the election outcomes they predict occur. Instead, the agency's message to the Court is: "None of your business." The medium for this message is the whole administrative-law toolbox of technical arguments of why the CFTC's decision should receive *no judicial scrutiny*. Most audacious is the agency's argument that the CFTC is not the one causing the February 15, 2023 crash landing of the political event contracts. As the agency now articulates, the Market operators should just ignore the Revocation and keep those contracts going and, if they choose not to, the traders should sue them. Opp. at 17. One missed the agency's articulation of an option to disregard its instructions in its formal "CFTC Letter 22-08," App'x 23-24, which ordered the contracts to be terminated on February 15, 2023, or else.

From there, the CFTC argues that there has been no "final agency action," so there can be no judicial review under the APA. Opp. at 8-12. The agency says that the No-Action Relief green lighting the PredictIt Market, and its abrupt revocation eight years later, is just a bunch of staff

running around with no authority. This claim does not survive a moment's contact with the agency's own regulations. Those regulations set up no-action relief as a tangible form of grace that can be secured from the agency. 17 C.F.R. § 140.99. Unlike in almost every single other precedent on which the agency now relies, the regulations provide no appeal to the Commission when the division to which it has delegated the power to provide this relief revokes it. Court after court has held that, when the decision of an agency official or division is the end of the road, it constitutes final agency action. Here, the Revocation of "no action relief" was the death of the PredictIt Market; it is final agency action under the Supreme Court's flexible and "pragmatic" approach. *See U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 599 (2016).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits of Their APA Claims

The CFTC does not argue that its Revocation was the product of reasoned decisionmaking. How could it? It summarily concluded, with no detail, that the Market operators had not complied with the dictates of its no-action letter. And then it specified the precise manner in which the Market must close, dumping innocent traders out of their investments on February 15, 2023, with no explanation of why less tumultuous remedies would not achieve the agency's objectives.

Without a substantive defense to its conduct, the CFTC turns to a series of equally flawed technical defenses about why its decisions should escape judicial scrutiny. But contrary to the CFTC's suggestion, Plaintiffs need not prove that they are "entitled to summary judgment or . . . certain to win." *French v. Fisher*, No. 1:17-CV-248-LY, 2017 WL 8727483, at *2 (W.D. Tex. Nov. 7, 2017). Plaintiffs need only—and here have— "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for a more deliberate investigation." *Id.* (quoting *Allied Home Mortg. Corp. v. Donovan*, 830 F. Supp. 2d 223, 227 (S.D. Tex. 2011)).

## A.     The Revocation Is Judicially Reviewable Final Agency Action

The CFTC ignores a fundamental principle of APA jurisprudence: The Supreme Court has instructed courts to take a "pragmatic" and "flexible" approach when assessing finality and the reviewability of agency action.  *Hawkes Co.*, 578 U.S. at 599; *see also Ciba-Geigy v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) (same).  The inquiry is about the *real-world effects* of an agency's behavior.  The Revocation's instruction to shut down the PredictIt Market by a date certain with dramatic and unfair effects on traders is clearly not insulated from judicial review under this test.

As the CFTC acknowledges, an agency action is final when it (a) "mark[s] the 'consummation' of the agency's decisionmaking process" and (b) determines "'rights and obligations'" or is an action from which "'legal consequences will flow.'"  Opp. at 9 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  The Revocation concluded the CFTC decisionmaking process about the PredictIt Market and its operation.  The Commission delegated the entire authority around no-action relief to its divisions.  And the CFTC regulations provide no higher authority (such as the Commission) to oversee the provision—and revocation—of no-action relief.  17 C.F.R. §§ 140.99(a)(2), (b)(1) ("Issuance of a Letter is entirely within the discretion of Commission staff.").  In other words, when a CFTC division issues no-action relief or revokes it, it does so at the Commission's direction and as its delegate.

Moreover, nothing in the CFTC regulations labels the delegated decisions as non-final or just a first round in the agency's process.  *See* 17 C.F.R. § 140.99; *see also id.* at § 140.99(e) (noting that the staff position is communicated in "final form").  Indeed, the regulations provide no procedure or ability to appeal the division's decision to grant, deny, or revoke no-action relief, which is the hallmark of final agency action.  *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (finding agency action was final when there was no "entitlement to further agency review"); *see also* Mot.

41

at 19 (marshalling additional authorities). This means that once the CFTC issued the Revocation, that was the end of the administrative process, demonstrating the finality of the agency's action.

The CFTC's rejoinder is to take broad view of all the agency's authorities and to claim that revoking formal no-action relief is only one small step on a long march to the five Commissioners voting to impose a penalty. Opp. at 9-10. This contention ignores that the agency's formal no-action relief gave birth to the PredictIt Market, the Market and traders organized their affairs around that authorization for eight years, and the Revocation took that authorization away without explanation. Pulling this long-term authorization to operate was in full view of the Commissioners, who were given an opportunity to object. Am Compl. at ¶ 77(d). The CFTC tries to couch the Revocation as mere advice, making much of the fact that it said that Victoria University "should"—rather than must—close the Market and suggesting that this language left the University a choice. Opp. at 10. But the Revocation presented no meaningful choice from the standpoint of Supreme Court precedent. The Supreme Court repeatedly has held that parties need not "wait[ ] for [the agency] to 'drop the hammer' in order to have their day in court." *Hawkes Co.*, 578 U.S. at 600; *see also Sackett*, 566 U.S. at 127 (same); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 490 (2010) ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law." (cleaned up)). And courts have treated regulatory dictates coupled with enforcement threats from subordinate agency officials—like the one issued by the CFTC in the Revocation—as final agency action subject to immediate review under the APA. *See, e.g.*, *W. Ill. Home Health Care, Inc. v. Herman*, 150 F.3d 659, 662-63 (7th Cir. 1998) (finding letter from assistant director of DOL division that characterized conduct as violation and threatened enforcement was final agency action). This is because those dictates are the consummation of an agency decisionmaking process, determine

rights and obligations, and have legal consequences. *See Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019) (determining agency guidance reviewable final agency action when "affected private parties are reasonably led to believe that failure to conform will bring adverse consequences").

The cases cited by the CFTC are not to the contrary. Opp. at 9-11. Those cases did not involve an unappealable mandate of an agency, coupled with a threat of enforcement. They all involved either (a) a circumstance in which agency regulations or procedure provided additional internal process following an adverse agency action[1] or (b) a circumstance in which the agency did not issue a mandate for future required action and threat of future enforcement in the absence of taking that action.[2] The Fifth Circuit's *Luminant* case is particularly distinguishable in this regard, as the EPA there was only making a preliminary finding about the regulated entity's historical compliance, perhaps suggesting enforcement action about behavior wholly in the past. *Luminant Generation*, 757 F.3d at 440-41; Opp. at 11. Here, the CFTC is giving forward-looking instructions and threatening sanctions if the University and the market operators do not conform.

---

[1] *See, e.g.*, *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1263 (D.C. Cir. 2018) (finding that letter from FTC staff rescinding staff opinion was not final agency action because impacted entity could seek review by Commission); *Holistic Candelers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (finding FDA warning letter was not final agency action because receiving entity could submit additional information to obtain approval or clearance for its device); *Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 (5th Cir. 2014) (finding that EPA notice of violation was not final agency action because regulations provided additional process following notice).

[2] *See, e.g.*, *Board of Trade of City of Chicago v. SEC*, 883 F.2d 525, 529-30 (7th Cir. 1989) (stating that SEC no-action letter was not final agency action because it only contained division's thoughts about whether proposed activity needed to comport with SEC registration requirements and did not put the futures market "in jeopardy" or "under the gun"); *Kixmiller v. SEC*, 492 F.2d 641, 643 (D.C. Cir. 1974) (involving no agency mandate or threat of enforcement); *N.Y. City Emps.' Ret. Sys. v. SEC*, 45 F.3d 7, 9-11 (2d Cir. 1995) (same); *Apache Corp. v. Chevedden*, 696 F. Supp. 2d 723, 725-34 (S.D. Tex. 2010) (same). The CFTC cannot seriously debate that withdrawing an approval to operate, instructing a business to close, threatening enforcement if the business did not close, and not providing a means for a review of that decision is vastly different than what was at issue in these cases. In addition, neither *Apache* nor *Kixmiller* nor *N.Y. City Employees' Retirement System* assessed whether the agency action at issue was final agency action under the APA.

43

Under the APA, an agency cannot tell a business it must end or face enforcement, while fending off judicial review based on an assertion that its administrative process has not ended.

### B.     The Revocation Was Not an Unreviewable Exercise of Prosecutorial Discretion

The CFTC makes a half-hearted argument that its actions are unreviewable because they were an exercise of prosecutorial discretion. Opp. at 12. All of the cases cited by the CFTC deal with an agency's decision not to prosecute or enforce. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (discussing decisions not to prosecute); *Bd. of Trade*, 883 F.2d at 531 (considering argument that SEC must take enforcement action); *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 993 F.3d 880, 882 (D.C. Cir. 2021) (deciding challenge to decision not to pursue enforcement action). The Plaintiffs in this case do not challenge a CFTC decision not to prosecute. They, instead, challenge the CFTC's decision to revoke its authorization for the PredictIt Market and its mandate for the Market to close by a date certain. Those actions do not fall into the "narrow[]" and "rare circumstances" where a decision is committed to agency discretion and APA review is unavailable. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018).

### C.     The CFTC's Revocation of the No-Action Relief Is Reviewable as a Revocation of a License Under Section 558(c) of the APA

The CFTC does not dispute that the APA broadly defines what constitutes a license or that the APA expressly permits court review when an agency withdraws a license without notice and an opportunity to be heard. Opp. at 8-9. The CFTC, instead, argues that the No-Action Relief was not a license because it did not "'permit' anyone to do anything." *Id.* at 9.

But the content of the No-Action Relief letter belies the CFTC's contention. The entire purpose of seeking No-Action Relief was to request that the CFTC "allow" Victoria University "to operate" the PredictIt Market without being required "to register" under the Commodity

Exchange Act. App'x at 16-17. That the No-Action Relief also included a division promise not to recommend an enforcement action does not change the fact that the decision was a Commission green light to establish the PredictIt Market and for traders confidently to buy and sell its offerings.

The No-Action Relief issued by the CFTC in this case is no different than other permissions that courts have found constitute a license under the APA. Courts have found that an agency's permission to allow an entity to avoid or to comply with modified administrative requirements constitutes a license under the broad definition of that term in the APA. *See* Opening Br. at 18 (collecting cases). And that is what happened here. In formal relief, authorized by the agency regulations (17 C.F.R. § 140.99), the Commission allowed the PredictIt Market to offer political event contracts without registering. Contrary to the CFTC's claims now (Opp. at 9, 12), the requested No-Action Relief was the only way to obtain the CFTC's permission to open the PredictIt Market, as the agency already had rejected permitting registered exchanges from offering political futures contracts. *See* Order Prohibiting the Listing or Trading of Political Event Contracts, CFTC (Apr. 2, 2012), https://tinyurl.com/3kwpb6td (attached as Exhibit A).

Contrary to the Commission's suggestion (Opp. at 8), the APA's mandatory procedures for revoking a license are not some limited artifact of the "customs and maritime contexts." *See, e.g.*, *Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1437 (9th Cir. 1991) (Department of Transportation certificate of authority to air carrier constituted a license); *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 961 (9th Cir. 2011) (withholding of approval for bear-resistant container by National Park Service was withholding of license under APA). Rather, whatever the industry, when an agency permits an entity to engage in a business and then revokes that permission, it must follow the procedures in Section 558(c), including providing interested parties like Plaintiffs an opportunity to be heard. The CFTC makes no effort to argue those procedures were honored here.

## II. The Trader, Academic, and Operator Plaintiffs Have Standing, and a Preliminary Injunction Is Necessary to Prevent Irreparable Harm

The CFTC interposes a standing objection, and claims that its Revocation decision is not causing irreparable harm, primarily by observing that Victoria University—the University that applied for the No-Action Relief—is not a party to this case. Only the University, the CFTC claims, has standing to complain about the Revocation. Opp. at 12-14. And, as the CFTC tells it, the University's independent decisionmaking about whether to close the Market in the face of the Revocation and the ability of the Plaintiffs to seek a monetary remedy against the Market operators kills standing and shows that there is no irreparable harm.

The CFTC's argument rests on a contention that, without the University, we just do not know whether it would have chosen on its own to throw thousands of traders out of their contracts on February 15, 2023. Opp. at 13-14. Of course, the University had no plans to offer contracts to traders based on 2024 elections, bring in their investments, and then terminate those contracts more than a year early. The CFTC's Revocation decision is causing that outcome. In Exhibit B to this reply, Victoria University removes all doubt: The University "had no intention of ending the PredictIt market prior to the CFTC's withdrawal of the NAL, and, but for the CFTC's action, they would have continued the markets for 2024 contracts through their natural conclusion." Moreover, the CFTC's suggestion that Victoria University and the operator Plaintiffs can just ignore the Revocation and its mandate to liquidate contracts by "11:59 p.m. eastern on February 15, 2023" as just some friendly (even if incredibly specific) advice is completely absent from the text of the Revocation decision. On top of that, a party impacted by agency action need not wait for sanctions to challenge an agency prescription of what must be done. *Hawkes Co.*, 578 U.S. at 600.

This case is leagues away from the *National Wrestling* case, where students were challenging an agency interpretative rule that gave universities a range of options to comply with

Title IX, and the university, years later, chose one of them. Opp. at 13-14 (citing *Nat'l Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930, 944 (D.C. Cir. 2004)). There is absolutely no wiggle room or menu of choices in the CFTC's Revocation: It demands the liquidation of contracts by 11:59 pm on February 15, 2023, full stop.

After chiding the Market operators for not asking long ago for some alternative, better form of agency decision that would entitle them to an explanation before the agency throws them out (Opp. at 4-5), the agency finally turns to the lead Plaintiff traders. Opp. at 17. The premature end of their election contracts and their resulting economic losses are not irreparable because, as the agency says, they can always sue the University and other operating entities for not blowing off the CFTC's market-termination mandate and hanging in there, even if sovereign immunity blocks any action against the CFTC. *Id.* That is nothing more than the agency's false refrain that entities must wait for the Government to level a devastating penalty before seeking review of its detailed regulatory mandates. The trader Plaintiffs are simply not required to lean on the Market Operators to risk dramatic penalties, in lieu of challenging an arbitrary decision that is placing their investments at risk. For these citizens, and for Congress in passing the APA, requiring an agency to explain itself before creating a mess is not too much to ask.

## III. The Equities and Public Interest Strongly Weigh in Favor of a Narrow Preliminary Injunction Against the CFTC's Mandate to Prematurely Liquidate Contracts

The balance of equities and public interest clearly point in favor of the narrow preliminary injunction requested here. All CFTC arguments to the contrary attack a broader injunction not sought in this motion. Opp. at 19-20. To be clear, the requested preliminary injunction does not seek to block enforcement action against any aspect of the PredictIt Market in perpetuity. It does, however, seek to bar enforcement of the CFTC's mandate—in its August 4 Revocation decision— that even those contracts turning on the outcome of the 2024 elections must be liquidated by

midnight on February 15, 2023. This arbitrary date—which will destroy the investments of the lead investor Plaintiffs and is already distorting trading in those contracts—serves *no meaningful purpose*, much less the "public interest." And even now, in its briefing, the CFTC does not try to explain this date picked from thin air. Nor does it try to explain why, even if there is somehow a reason, the Market should close, these contracts should not trade to their natural conclusion, and all this unnecessary loss to investors and disruption to the Market should not be avoided. Such a position, after all, would be hard to square with the No-Action Relief decision, in which the agency found that the data and academic value produced by the PredictIt Market was in "the public interest." App'x at 20.

In any event, courts have been clear that holding an agency to the straightforward requirement of reasoned decisionmaking before issuing edicts is in the public interest. *See, e.g.*, *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.C. Cir. 2009) ("The public interest is served when administrative agencies comply with their obligations under the APA."). Absent from the opposition is any suggestion of an emergency that would justify leaving the agency's inadequately reasoned Revocation mandate in place.

Nor would this case open the floodgates to litigation, dragging every informal staff opinion into court. Opp. at 18-19. This is a course of agency decisionmaking that opened a political futures market and abruptly closed it eight years later. It is not a musing on what an agency's authorities might or might not require. Permitting challenge here would only ensure that when the agency takes an action against a party's conduct that causes real and immediate harm, the agency does so in a reasoned way. There can be no debate that this is in the public interest.

## CONCLUSION

For the above reasons, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

Dated:  October 20, 2022

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
T: (202) 778-2204
medney@huntonak.com

John J. Byron
STEPTOE & JOHNSON LLP
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
T: (312) 577-1300 / F: (312) 577-1370
jbyron@steptoe.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2022, a copy of the foregoing was filed electronically and was served on counsel of record through the Court's electronic case filing/case management (ECF/CM) system.

/s/ Michael J. Edney
Michael J. Edney

*Attorney for Plaintiffs*

# Exhibit B



**Professor Margaret Hyland**
**VICE-PROVOST (RESEARCH)**
MARUĀRANGI
**VICTORIA UNIVERSITY OF WELLINGTON,** PO Box 600, Wellington 6140, New Zealand
**Phone** + 64 4 463 5963      **Email** margaret.hyland@vuw.ac.nz      **Web** wgtn.ac.nz

15 September 2022


David Mason
General Counsel and Chief Compliance Officer
Aristotle International, Inc.
205 Pennsylvania Ave., SE
Washington, DC 20003



Dear David

**PredictIt – Litigation**

We refer to Aristotle's request for certain confirmations relating to this matter.

*Background*

We set out the background for context, which you are of course familiar with.

Victoria University of Wellington, New Zealand (**VUW**) was the recipient of a No Action Letter from the US Commodity Futures Trading Commission (**CFTC**) in 2014 authorizing VUW to operate a political prediction market in the United States.  Since that time, VUW has operated the market through its subsidiary Victoria Link Limited (**VLL**) using the name PredictIt.  On August 4, 2022, the CFTC issued a letter revoking the No Action relief and instructed Victoria to close all trading by February 15, 2023.

Aristotle and traders on PredictIt have commenced litigation against the CFTC in relation to the withdrawal.  Neither of VUW or VLL are involved with the litigation, but Aristotle has independent standing to seek judicial relief in respect of its separate interests.  Aristotle has requested that VUW and VLL confirm certain facts for the purposes of the litigation.  VUW and VLL are prepared to do this, noting they could be compelled to do so anyway.

*Confirmations*

I am familiar with VUW's and VLL's operation of the PredictIt market and can state that:

•       VUW and VLL had no intention of ending the PredictIt market prior to the CFTC's withdrawal of the NAL, and, but for the CFTC's action, they would have continued the markets for 2024 contracts through their natural conclusion; and

**52**

- VUW and VLL intend to comply with the terms of the CFTC's withdrawal letter and therefore close the 2024 contracts in advance of their maturity unless the withdrawal letter is amended, abrogated, or suspended.

Margaret Hyland
Vice-Provost (Research)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

22 NOV 18  PM 3: 06

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| KEVIN CLARKE; TREVOR BOECKMANN; HARRY CRANE; CORWIN SMIDT; PREDICT IT, INC.; AND ARISTOTLE INTERNATIONAL, INC., §§§§§ | |
| PLAINTIFFS, §§ | CAUSE NO. 1:22-CV-909-LY |
| V. §§ | |
| COMMODITY FUTURES TRADING COMMISSION, §§ | |
| DEFENDANT. § | |

## ORDER

**IT IS HEREBY ORDERED** that Defendant CFTC's Motion to Dismiss filed October

28, 2022 (Doc. #19) and Plaintiffs' Memorandum in Opposition to Motion to Dismiss filed

November 14, 2022 (Doc. #21) are **REFERRED** to United States Magistrate Mark Lane for

Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B),  Federal Rule of Civil

Procedure 72,  and  Rule 1(d)  of  Appendix C of the Local Rules of the United States District

Court for the Western District of Texas, as amended.

SIGNED this _____*18th*_____ day of November, 2022.

_____
LEE YEAKEL
UNITED STATES DISTRICT JUDGE

54

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| KEVIN CLARKE, TREVOR BOECKMANN, HARRY CRANE, CORWIN SMIDT, PREDICT IT, INC., ARISTOTLE INTERNATIONAL, INC., MICHAEL BEELER, MARK BORGHI, RICHARD HANANIA, JAMES D. MILLER, JOSIAH NEELEY, GRANT SCHNEIDER, and WES SHEPHERD, | Case No. 1:22-cv-00909 |
| | The Honorable Lee Yeakel |
| Plaintiffs, | |
| v. | |
| COMMODITY FUTURES TRADING COMMISSION, | |
| Defendant. | |

## MOTION TO EXPEDITE HEARING AND RESOLUTION OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Kevin Clarke, Michael Beeler, Trevor Boeckmann, Mark Borghi, Harry Crane, Richard Hanania, James D. Miller, Josiah Neeley, Grant Schneider, Wes Shepherd, Corwin Smidt, Predict It, Inc. ("PredictIt"), and Aristotle International, Inc. ("Aristotle") respectfully move for a more expedited hearing and resolution of their pending Motion for Preliminary Injunction, Doc. 12. The motion was filed on September 30 and was fully briefed by October 20. Specifically, Plaintiffs ask that the Court schedule a motion for a preliminary injunction for a hearing designed to allow the Court to render a decision before Christmas.[1] Plaintiffs are prepared to file their reply to the Defendant's briefing on this motion the following business day.

---

[1] Plaintiffs regard the instant motion as a "case-management motion" pursuant to Local Rule CV-7(D)(2), for which any response would be due within seven days, on November 25, 2022.

The PredictIt Market offers political event contracts, where tens of thousands of private citizens can invest and have invested in their predictions of the outcome of an election or other significant political event. The Commodity Futures Trading Commission permitted this Market to be established in 2014 and abruptly ordered it to close in a decision released on August 4, 2022. Although Plaintiffs' lawsuit is a broader challenge to the Commission's decision to close the PredictIt Market, the preliminary injunction motion seeks to stay a narrow aspect of the Commission's decision that is causing irreparable harm. That is the Commission's mandate to liquidate all pending PredictIt Market contracts—including contracts the Market's customers purchased prior to the Commission's decision to close the Market—by 11:59 PM on February 15, 2023. This mandate will wipe out tens of thousands of shares of contracts that would not otherwise settle until late 2023 or 2024, including contracts regarding the outcome of the 2024 U.S. presidential primary and general elections.

That arbitrary liquidation date was causing irreparable harm at the time of the motion and is causing irreparable harm today. But these injuries will dramatically accelerate beginning in the middle of December 2022. First, lead Plaintiff and Austin-resident Kevin Clarke and the seven other private investor Plaintiffs have invested tens of thousands of dollars in contracts that the Commission intends to crash land on February 15. That is not just a problem on February 15— the Commission's mandate is severely distorting trading in those contracts today. Mr. Clarke, for example, bought contracts before the Commission's decision on Republican nominees for President that, under normal conditions, would have traded up significantly after the midterm elections. Ex. 1, Declaration of Kevin Clarke, ¶ 6. Those contracts have not traded as expected,

---

Underscoring the urgency of this matter, Plaintiffs commit to file any reply in response to this motion the next business day, on November 28, 2022.

however, as traders believe the Market will not exist long enough for those candidates to even formally announce their candidacies. Ex. 1, ¶ 6.  As important, the Commission's February 15 drop dead announcement has driven many traders and thus significant liquidity out of the Market. Ex. 1, ¶ 5. There is often no one to whom the Plaintiffs may efficiently sell their existing positions, much less at a price that makes any sense.  Ex. 1, ¶ 7.  Mr. Clarke and the other trader Plaintiffs are simply stuck with these contracts, all because the Commission has picked an arbitrary date on which these contracts must be liquidated.  These market distortions are expected to become substantially worse in December, as traders become no longer focused on the midterm elections and turn their attention to the February 15 liquidation date that is interfering with seeing contracts on the 2024 election through to their conclusion. Ex. 1, ¶ 8.  As the Government with its sovereign immunity is causing this mess, the economic harm on these traders is irreparable.  Ex. 1, ¶¶ 7–9.

The Plaintiffs who operate the Market—Aristotle International, Inc. and PredictIt, Inc—have put off for as long as they could the massive investment in systems necessary to comply with the February 15 liquidation mandate.  By December 15, however, the operators must plunge hundreds of thousands of dollars into compliance with the most arbitrary aspect of the Commission's decision to close the Market.  Ex. 2, Declaration of John Phillips, ¶ 3.  Nearly all the Plaintiffs' PredictIt employees will need to be diverted to developing a system for prematurely liquidating investor contracts.  Ex. 2, ¶¶ 3, 9.  The Market has systems to settle a contract when the outcome of a political event is decided for $1 or $0.  It has no programs or infrastructure to settle a contract for an intermediate price (such as its purchase price or its daily trading price) before the political event is determined.  Ex. 2, ¶ 6.  This trading and settlement infrastructure must be built from scratch and will require extensive planning, design, coding, and testing.  Ex. 2, ¶ 8. And the fairest way to do so has not even been determined yet—if in fact there is a way to do so

3

that is fair to all traders. From construction to testing, this investment must occur in mid-December, two months before the Commission's arbitrary crash-landing liquidation date. Ex. 2, ¶ 8. The Plaintiffs firmly believe the Commission's contract liquidation mandate is arbitrary and impermissible, and are confident the Court will agree when it hears to merits. But, if the Court ultimately rules for the Plaintiffs, the operating corporations will have no way to recover the hundreds of thousands spent on compliance. Ex. 2, ¶ 5. All those expenses will have been unnecessary, and all solely the result of administrative agency behavior that violates the Administrative Procedure Act.

The whole point of the requested preliminary injunction is to avoid these accelerated irreparable injuries rolling on in December, by preserving an aspect of the status quo before the agency's arbitrary action. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties until a trial on the merits can be held."). The requested relief is narrow and targeted. It is not asking the Court to allow PredictIt to offer contacts on brand new political questions. Rather, for political event markets offered as of the August 4 Commission decision, it asks the Court to allow the contracts in those markets to trade either to their natural conclusion or 90 days after this Court's resolution of the merits, whichever is sooner. Doc. 12, at 2.

The objective of this preliminary injunction will be substantially eroded if the Court does not hear it and resolve it in December. Chambers staff have informed counsel for the Plaintiffs, however, that the motion will be taken up only after the Commission's pending motion to transfer is decided. And that transfer motion is scheduled for oral argument before Magistrate Judge Lane on December 1, likely portending a proposed resolution of that motion in mid-December at the

earliest.  If this sequencing structure remains in place, a resolution of the preliminary injunction motion is unlikely in 2022, and avoidable and significant irreparable harm and expense will occur.

Accordingly, the Plaintiffs respectfully request that the District Court hold oral argument on the motion for a preliminary injunction at its earliest convenience and in parallel with any Magistrate Judge consideration of making a report and recommendation to the Court on the Government's motion to transfer venue.  This request for more expedited treatment and priority over other motions in the case is in line with precedents underscoring the urgency of a preliminary injunction motions.  Courts grant preliminary injunctions in order to "prevent irreparable injury that may result before a final decision on the merits."  *Shanks v. City of Dallas*, 752 F.2d 1092, 1096 (5th Cir. 1985).  To serve that function here, the Court must act with the "haste" that "is often necessary if [the parties'] positions are to be preserved."  *Camenisch*, 451 U.S. at 395.

Recognizing the urgency associated with preliminary relief, courts regularly decide motions for preliminary injunctions before addressing other matters in the case.  In *Janvey v. Alguire*, for example, the Fifth Circuit affirmed a district court's grant of a preliminary injunction motion before considering a motion to compel arbitration.  647 F.3d 585, 592 (5th Cir. 2011). Even in the face of the Supreme Court's "strong preference for arbitration," the court found that the district court appropriately "relied on its equitable powers to preserve the status quo" before rushing to decide the arbitration issue.  *Id.* at 593–94.  More specifically addressing the circumstance of this case, district courts routinely consider preliminary injunction motions in advance of or alongside transfer motions.  *See, e.g., Waguespack v. Medtronic, Inc.*, 185 F. Supp. 3d 916, 921 (M.D. La. 2016) (simultaneously granting preliminary injunction and denying motion to transfer); *Louisiana Forestry Ass'n, Inc. v. Solis*, 814 F. Supp. 2d 655, 656 (W.D. La. 2011) (considering preliminary injunction motion together with motion to transfer); *Swisher Int'l, Inc. v.*

*United States Food & Drug Admin.*, No. 3:21-CV-764-BJD-JBT, 2021 WL 4173841, at *2 (M.D. Fla. Sept. 7, 2021) (same).  Indeed, a defendant's effort to adjust where the case is heard, and the delay that request entails, makes it all the more important to preserve the status quo extant before an allegedly arbitrary agency decision while those procedural issues are being sorted.

There is no other side of the ledger here in terms of pushing off the February 15, 2023 liquidation date.  There is clear harm in that date to the Plaintiffs, but the Commission has never suggested any legitimate interest on why liquidation must occur on that date rather than another. Despite several opportunities to do so over the life of this case, the CFTC has never provided *any* justification for why all existing contracts in the Market must dissolve on February 15, 2023.  The date appears to have been plucked out of thin air.

Plaintiffs are sensitive to the demands of the many cases on the Court's docket.  But Plaintiffs have made motion for relief that is inherently time sensitive and that the appellate courts regard as effectively denied if not resolved before the occurrence of significant swaths of the irreparable harm identified therein.  *See EEOC v. Kerrville Bus Co.*, 925 F.2d 129, 132 (5th Cir. 1991); *U.S. v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962).  And, indeed, Congress has recognized that when a serious challenge in the agency decision is presented, the best course is to delay aspects of that decision causing irreparable harm until the Court can address the merits of that challenge. *See* 5 U.S.C. § 705; *Abbott Labs v. Gardner*, 387 U.S. 136, 156 (1967) (explaining that Congress expressly authorized courts to delay the effective date of an agency action to permit judicial review before the action harms regulated parties).  In the absence of more expedited treatment of the preliminary injunction motion than is currently projected, there may soon come a time when Plaintiffs' harm becomes so "immediate and irreparable" that Plaintiffs have no choice but to seek a temporary restraining order.  *See* Fed. R. Civ. P. 65(b)(1).

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the motion to expedite and set the Motion for Preliminary Injunction for a hearing by December ___, 2022. Consistent with Local Rule CV-7(G), counsel for Plaintiffs has conferred with counsel for Defendant, who represents that Defendant opposes the motion to expedite.

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue,
NW Washington, DC 20037
T: (202) 778-2204
medney@huntonak.com

John J. Byron
STEPTOE & JOHNSON LLP
227 West Monroe Street
Suite 4700
Chicago, Illinois 60606
T: (312) 577-1300 / F: (312) 577-1370
jbyron@steptoe.com

*Attorneys for Plaintiffs Kevin Clarke, Trevor Boeckmann, Harry Crane, Corwin Smidt, Predict It, Inc. Aristotle International, Inc., Michael Beeler, Mark Borghi, Richard Hanania, James D. Miller, Josiah Neeley, Grant Schneider, and Wes Shepherd*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of November, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record for all Parties.

/s/ Michael J. Edney
Michael J. Edney

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |
|---|---|
| KEVIN CLARKE, TREVOR BOECKMANN, HARRY CRANE, CORWIN SMIDT, PREDICT IT, INC., ARISTOTLE INTERNATIONAL, INC., MICHAEL BEELER, MARK BORGHI, RICHARD HANANIA, JAMES D. MILLER, JOSIAH NEELEY, GRANT SCHNEIDER, and WES SHEPHERD, | Case No. 1:22-cv-00909

The Honorable Lee Yeakel |

Plaintiffs,

v.

COMMODITY FUTURES TRADING
COMMISSION,

Defendant.

## [PROPOSED] ORDER

The Plaintiffs' Motion to Expedite Hearing on Plaintiffs' Motion for Preliminary Injunction is **GRANTED**. The Court hereby **SETS** Plaintiffs' Motion for Preliminary Injunction for hearing at _____ on December _____, 2022.

**So ORDERED and SIGNED on this _____ day of November 2022.**


_____

UNITED STATES DISTRICT JUDGE

**63**

# **Exhibit 1**

# Declaration of Kevin Clarke
# (November 18, 2022)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| KEVIN CLARKE, in his individual capacity, TREVOR BOECKMANN, in his individual capacity, HARRY CRANE, in his individual capacity, CORWIN SMIDT, in his individual capacity, PREDICT IT, INC., a Delaware corporation, and ARISTOTLE INTERNATIONAL, INC., a Delaware corporation, MICHAEL BEELER, in his individual capacity, MARK BORGHI, in his individual capacity, RICHARD HANANIA, in his individual capacity, JAMES D. MILLER, in his individual capacity, JOSIAH NEELEY, in his individual capacity, GRANT SCHNEIDER, in his individual capacity, and WES SHEPHERD, in his individual capacity,<br><br>        Plaintiffs,<br><br>   v.<br><br>COMMODITY FUTURES TRADING COMMISSION,<br><br>        Defendant. | Case No. 2022-cv-00909 |

## <u>DECLARATION OF KEVIN CLARKE</u>

I, Kevin Clarke, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, and that I am competent to testify to the matters stated herein:

1.     My name is Kevin A. Clarke.  I am a resident of Austin, Texas, where I am the owner of Clarke Mineral Estate and Geosciences, LLC, and an Assistant Coach for the University of Texas at Austin's Policy Debate Team.

2.     I have personal knowledge of the facts stated herein.

3.     I have traded on the PredictIt Market for two years.  At the time I began trading on the PredictIt Market, I investigated the Market's operations and discovered that the Market

is operated pursuant to CFTC Letter No. 14-130 (the "No-Action Relief"), which I understand permitted the PredictIt Market to operate without formally registering as an exchange with the CFTC. Knowing that the CFTC had signed off on the PredictIt Market's operations assured me that, when I bought contracts on the PredictIt exchange, they would be permitted to trade until they were settled by the outcome of the election or political event they predicted.

4.      I am aware that the CFTC revoked the No-Action Relief in CFTC Letter 22-08, entitled "Withdrawal of CFTC Letter No. 14-130" (the "Revocation"). The Revocation has had a direct and immediate impact on the value of PredictIt Market event contracts.

5.      Specifically, I have witnessed the following distortions since the Revocation decision:

- A general loss of trading volume on the Market due to traders exiting the Market. I often cannot find anyone to sell a position to at any reasonable price or in any reasonable amount of time.

- A destabilization of prices causing the potential for high volatility. Given this state of affairs, a relatively small development causes a negative feedback loop without many traders to come in and smooth the pricing. Such a feedback loop could quickly crash the prices with no chance of recovery.

6.      These distortions have altered the reliability of the Market's predictions and significantly affected my ability to sell my investments into the Market, at the opportunities and intervals I would have expected. The Market's current numbers on specific contracts vary from what an experienced trader would expect in light of recent events like the midterm elections, if traders were viewing the contract as one that could be held until the projected election outcome or event occurred.

- As one example, I purchased several contracts in the Republican Party Presidential Nomination Market, prior to the Commission's decision to require all PredictIt

contracts to liquidate on February 15, 2023, predicting that third or fourth tier candidates would win the nomination. I purchased these contracts at relatively low prices this summer. In a Market not disrupted by the Commission's decision, I would expect these contracts to significantly rise in value once Former President Trump was wounded by poor election results and given the possibility of the top two candidates wounding each other and opening up a spot for a third or fourth level candidate. One would expect to see third and fourth level candidates surging on the Market. But that is not happening, as I presume that traders do not believe that the Market will exist long enough for these candidates to even announce their candidacies for President. As such, I am left with investments that are under water and on which I am going to lose substantial sums, if I had to sell at today's prices. If I exited at today's prices, I would lose 20 percent on my investment that Mike Pence is going to be the nominee, 33 percent on Tim Scott, 40 percent of Mike Pompeo, 80 percent on Ted Cruz, at 65 percent on Josh Hawley.

7.      These market distortions have left me stranded with several valuable positions, unable to find buyers who are trading on projections of the outcome of the election or political event. The Commission's arbitrary cut off date is causing me today to loss money and not have a meaningful option to sell my positions to other parties who are looking to the outcome of a later election, as I was when I bought the contracts.

8.      I expect these market distortions to become substantially worse in December, as traders become no longer focused on the midterm elections and turn their attention to the February 15 liquidation date interfering with seeing a contract on the 2024 election through to its conclusion.

9.      Finally, the CFTC's February 15, 2023 cut-off date also guarantees loss of investment, and the most sophisticated traders will be more adversely effected. If the market operators liquidate at the price entered, then unrealized gains will be erased. If the Market

**67**

operators return the money based on market price at a time certain, then this opens up the markets

to manipulation, where traders could buy up the price seconds before the deadline.

I declare under the penalty of perjury that the foregoing is true and correct.

        Executed on November 18, 2022

                                          /s/ Kevin Clarke
                                           Kevin Clarke

# Exhibit 2

Declaration of John Phillips
(November 18, 2022)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| KEVIN CLARKE, in his individual capacity, TREVOR BOECKMANN, in his individual capacity, HARRY CRANE, in his individual capacity, CORWIN SMIDT, in his individual capacity, PREDICT IT, INC., a Delaware corporation, and ARISTOTLE INTERNATIONAL, INC., a Delaware corporation, MICHAEL BEELER, in his individual capacity, MARK BORGHI, in his individual capacity, RICHARD HANANIA, in his individual capacity, JAMES D. MILLER, in his individual capacity, JOSIAH NEELEY, in his individual capacity, GRANT SCHNEIDER, in his individual capacity, and WES SHEPHERD, in his individual capacity,<br><br>Plaintiffs,<br><br>v.<br><br>COMMODITY FUTURES TRADING COMMISSION,<br><br>Defendant. | Case No. 2022-cv-00909 |

## DECLARATION OF JOHN PHILLIPS

I, John Phillips, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, and that I am competent to testify to the matters stated herein:

1.      My name is John Phillips.  I am the Chief Executive Officer of both Aristotle International, Inc. ("Aristotle"), and PredictIt, Inc. ("PredictIt").

2.      I have personal knowledge of the facts stated herein.

3.      We have a team of seven fully dedicated and 18 shared employees that service the PredictIt Market and ensure that the Market is running efficiently, reliably, and smoothly for our tens-of-thousands customers.   Our team is now facing the task of complying with the August 4, 2022,

**70**

revocation decision of the Commodity Futures Trading Commission that orders the PredictIt Market to close and to liquidate all exiting contracts held by private traders on or before 11:59 pm on February 15, 2023. It is a significant understatement that determining how to liquidate these contracts and to stand up a system to do so cannot happen overnight. As explained below, Aristotle International, Inc., and PredictIt, Inc., will have to divert nearly all PredictIt employee resources and hundreds of thousands of dollars to establish a system for liquidating existing contracts starting no later than early December 2022.

4.      Aristotle, PredictIt, and several traders and academics have asked the Court for a preliminary injunction that would push back this mandatory contract liquidation date while the Court considers our claims that the revocation decision was insufficiently explained and too arbitrary, in violation of the Administrative Procedure Act. Pushing back this date, even to 90 days after this Court decides the underlying case, will spare Aristotle and PredictIt the massive expense and diversion of resources required to stand up a system to liquidate these contracts before February 15, 2023.

5.      With regard to that date, I am not aware of any reason why the CFTC decided contracts had to be liquidated by February 15, 2023, or why the CFTC cannot let the contracts that were trading on the date of its revocation decision continue trading until the elections or other political events they predict occur. The date itself seems to be chosen from thin air, and I have not seen a defense by the agency of why that date or another must be enforced. I believe the agency has virtually no interest in requiring the premature liquidation of PredictIt contracts, much less in requiring that such liquidation occur on February 15, 2023, rather than some later date that allows the Court to decide this matter before our companies start spending hundreds of thousands on compliance.

6.      I want to explain further why we must begin in early December 2022 plunging significant resources into programming a system for compliance with the February 15, 2023, date. Every PredictIt market depends on a 'trade engine'—a series of coded procedures—to execute trades between counterparties and to settle contracts when they are deemed closed by the site's

Rules Committee. This engine or process has been designed so that contract closure requires a determination by the Committee that a contract shall either be paid out in full—in other words, at a $1 value when its underlying predication has been deemed correct or liquidated with no compensation to the contract holder when the prediction has been deemed incorrect. That is a binary decision. There is no provision in the coding of the PredictIt trade engine for contracts to be settled for anything other than $1 or $0, as this is inimical to the trading logic on which the site operates.

7.      When a contract has a linked outcome, such as the winner of a nomination or election, the engine requires the designation of one, and only one, contract to be paid out in full. All other associated margin-linked contracts are then settled at zero value. For instance, only one of the 17 candidates currently listed in the 2024 Republican Presidential nomination market can win the nomination; the other 16 contracts would settle at zero under existing market rules.

8.      We are not currently equipped to settle markets in any way other than by the outcome of the election or the occurrence of a political event on which the contract turns. To settle contacts on an arbitrary date, like February 15, 2023, at a price other than $1 or $0 will require the selection, design, coding, testing, and execution of an entirely new settlement procedure. Implementation of such a process involves multiple steps of engaging staff with different expertise.

- First, PredictIt must choose a method by which to settle contracts prematurely, contrary to the established rules governing those contracts and without guidance from the CFTC. The method must be fair to traders but must also be designed to ensure that there are sufficient funds to settle all markets. Consideration of the most appropriate settlement method is already underway and key company staff are already being diverted from their normal duties for this purpose.

- Second, having selected a settlement method, the company's software development department and data analysts must develop calculations and processes by which to

assess the feasibility of these decisions in the site's existing coding environment. These processes are subject to review by management. Working backwards from a 4–5-week software development process (discussed below) this conceptual design process must begin in early December to meet the February 15 deadline. Contracts with linked outcomes (*i.e.* contracts pertaining to a multi-candidate election) pose a particular challenge since PredictIt employs a risk-calculation mechanism that reduces the collateral required for traders buying related contracts. In brief, the trade engine recognizes that a trader shorting multiple presidential candidates, for example, is guaranteed to "win" all but one of those positions, at minimum, since only one person can win the election. In the normal settlement of contracts, such linked short positions are unwound in a parallel fashion. But such "multiple-contract markets" typically have collective valuations near to but not exactly $1 while they are active, leaving the possibility that settlement at live price will not fully restore funds to all traders or will generate a deficit in the clearing house.

- Third, after determination and review of a settlement method, PredictIt staff need to create a private, parallel instance of the live market in order to test procedures. Software developers need to write altogether new code for the trade engine to allow for the execution of the extraordinary settlement method. Once written, this code needs to be reviewed by quality assurance specialists, revised, and tested, through several iterations. This entire development process would consume four to five business weeks, at minimum. Because the CFTC's market shut down deadline of February 15 is not flexible and must be complied with on pain of massive threated government penalties, we must allow more than the projected five weeks to allow for possible programming delays. Thus, programming must begin during the month of December.

9.      The diversion of programmers for the extended period necessary to implement these changes will impose substantial direct and opportunity costs on the company.  All of the employees assigned to PredictIt, comprising 20% of Aristotle's total workforce, will be affected by a partial or complete diversion of their work from other efforts to shut down tasks.  Not only will we incur salary and overhead costs for that period of work, we will also delay or lose the projects those programmers would otherwise be completing.  In total this diversion of effort threatens to trigger a two-to-three month delay in the launch of our next major business venture.

10.     Finally, we have experienced a significant withdrawal of funds from the PredictIt market in the days since the mid-term election.  The combination of the CFTC's prohibition on new markets and the impending shutdown order has left traders with few attractive investment choices in the market.  As the CFTC's shutdown deadline approaches, liquidity in remaining markets is likely to decrease as more traders sell their positions and exit the market entirely. Increasingly illiquid markets increase the risk of extreme price movements unrelated to underlying political events and make it more difficult for remaining traders to exit their positions at fair prices.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on November 18, 2022

/s/ John Phillips

John Phillips

**74**

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

Case: 22-51124        Document: 6        Page: 111        Date Filed: 01/03/2023

| | |
|---|---|
| KEVIN CLARKE, in his individual capacity, TREVOR BOECKMANN, in his individual capacity, HARRY CRANE, in his individual capacity, CORWIN SMIDT, in his individual capacity, PREDICT IT, INC., a Delaware corporation, and ARISTOTLE INTERNATIONAL, INC., a Delaware corporation, MICHAEL BEELER, in his individual capacity, MARK BORGHI, in his individual capacity, RICHARD HANANIA, in his individual capacity, JAMES D. MILLER, in his individual capacity, JOSIAH NEELEY, in his individual capacity, GRANT SCHNEIDER, in his individual capacity, and WES SHEPHERD, in his individual capacity,<br><br>        Plaintiffs,<br><br>  v.<br><br>COMMODITY FUTURES TRADING COMMISSION,<br><br>        Defendant. | Case No. 1:22-cv-00909-LY |

## DECLARATION OF J. RICHARD LOWERY

I, J. Richard Lowery, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, and that I am competent to testify to the matters stated herein:

1.      My name is J. Richard Lowery. I am a resident of Austin, Texas, where I am an Associate Professor of Finance at the University of Texas at Austin's McCombs School of Business.

2.      I have personal knowledge of the facts stated herein.

3.      I am an applied game theorist with a PhD in economics from Carnegie Mellon

University, with research in banking, investment banking, market efficiency and information aggregation, among other topics.

4.     In 2010, I, with my colleagues, published a paper analyzing the accuracy of prediction markets—like the PredictIt Market—at predicting the outcomes of future events.  See Paul J. Healy, Sera Linardi, J. Richard Lowery, John O. Ledyard, *Prediction Markets: Alternative Mechanisms for Complex Environments with Few Traders*, 56 MGMT. SCI. 1977 (2010), a true and correct copy of which is attached hereto as Exhibit A.  One of the motivations of the article was to test whether prediction markets yield reliable prediction data when the number of participants in the market is small.  We concluded that these small-scale prediction markets do not produce more reliable prediction data than polling or other prediction methods. *Id.* at 1978–79.

5.     Prediction markets are most reliable in environments where the informed views of as many individuals as possible can be aggregated to predict an outcome.   And market participants—like PredictIt Market investors—with a financial stake in their predicted outcome are more likely to educate themselves on relevant issues to inform their market participation and more likely to put aside bias and invest rationally.  Ultimately, this reduced bias and informed decisionmaking gives the market participation of PredictIt Market investors more predictive value.

6.     Prediction market data is also more reliable when market participants with strongly held (perhaps more informed) opinions have the ability to make a large investment in their predicted outcome, allowing them to affect—without overwhelming—the market percentage-trading price when they feel that percentage-trading price is inaccurate.  In markets with large numbers of participants, large investments can shift but will likely not excessively

Case: 22-51124     Document: 6     Page: 113     Date Filed: 01/03/2023

distort the percentage-trading price because such investments will be counterbalanced by the numerous smaller investments of other traders.  In markets with very few market participants, however, large investments are likely to artificially distort the percentage-trading price because the market is insufficiently liquid to counterbalance the large investment.

7.     The PredictIt Market's investment parameters—the limitation on 5000 traders investing no more than $850 in a given event market—strike an important balance based on the considerations outlined above.  Requiring a monetary investment that is capped high enough to allow traders with strong convictions to affect the percentage-trading price when they believe it to be inaccurate, produces more reliable outcomes.     And the large number of traders—5000—that may participate in an event market counterbalances market manipulation by traders with deep pockets and provides a larger amount of data that can be aggregated to produce a more reliable percentage trading price.

8.     At the same time, these limits keep traders from developing such a significant financial stake in any given outcome that they would be incentivized to manipulate the outcome. I understand that these were modifications from the Iowa Electronic Market that Victoria University sought and the CFTC approved in 2014.  In short, these expanded limitations are the key to generating academically meaningful data without teetering into the realm of gambling.

9.     I understand that the CFTC has revoked CFTC Letter No. 14-130, which allowed the PredictIt Market to operate without complying with certain laws and CFTC regulations that are potentially applicable to the Market. In effect, I understand that all contracts must be closed or liquidated by February 15, 2023.

10.     The PredictIt Market's closure will negatively impact the academic research community.  The point of the PredictIt Market is to generate real-time estimates of probability in

Case: 22-51124     Document: 6     Page: 114     Date Filed: 01/03/2023

time.  PredictIt data provides a stable metric of probability of political outcomes that correlates with real economic activity and other behaviors. And by comparing PredictIt data with other real-world events, researches can analyze how political variables influence financial markets or other real-time decisions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12/7/2022

_____
J. Richard Lowery

# Exhibit 1

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| KEVIN CLARKE, TREVOR BOECKMANN, HARRY CRANE, CORWIN SMIDT, PREDICT IT, INC., ARISTOTLE INTERNATIONAL, INC., MICHAEL BEELER, MARK BORGHI, RICHARD HANANIA, JAMES D. MILLER, JOSIAH NEELEY, GRANT SCHNEIDER, and WES SHEPHERD,<br><br>        Plaintiffs-Appellants,<br><br>v.<br><br>COMMODITY FUTURES TRADING COMMISSION,<br><br>        Defendant-Appellee. | Case No. 22-51124 |

## <u>DECLARATION OF JOHN PHILLIPS</u>

I, John Phillips, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct, and that I am competent to testify to the matters stated herein:

1.      My name is John Phillips. I am the Chief Executive Officer of both Aristotle International, Inc. ("Aristotle"), and PredictIt, Inc. ("PredictIt").

2.      I have personal knowledge of the facts stated herein.

3.      Since the CFTC withdrawal announcement on August 4 PredictIt traders have withdrawn $18 million from the market. Over 7,500 traders have

withdrawn all of their funds and closed out their accounts.

4.      These withdrawals appear to be accelerating.  2,821 traders withdrew all of their funds in the three months from August to October.  2,724 traders withdrew all of their funds in November.  Approximately 2,000 more did so in December in a declining trader base.  These withdrawals represent a major loss of liquidity in the market, making it more and more difficult for remaining traders to trade or liquidate their positions.

5.      The decline in active trading has been even more precipitous.  In the year prior to the CFTC's withdrawal announcement, an average of 1,400 traders traded in the PredictIt market on any given day, trading an average of 1.27 million shares per day.  Those average daily trader numbers held up in August (1,488 traders per day), due in part to traders cashing out their positions after the CFTC announcement, dipped in September (929 daily traders on average), recovered in October (1,574 traders daily on average), and then rose in November (2,891 daily traders trading on average) due to the mid-term elections.  The averages held up somewhat through December 7 due to the Georgia runoff on December 6 (1,287 traders per day average from December 1-7).  After December 7, the number of daily traders plummeted, averaging below 700 traders per day with just over 500,000 shares traded during the second week of December, and is continuing to fall, averaging only 502 traders per day for the third week of December (December 16-

22).

6.      This precipitous decline in daily trader numbers and volume is unprecedented.  Trading reached a similar peak, for instance, in the last mid-term election with trading in November 2018 averaging 2,318 traders per day.  Even without a runoff election in 2018, trading in the first 24 days of December held up with an average of 1,400 daily traders trading an average of 1.3 million shares daily. Not until Christmas Day 2018 did the daily trader number fall below 1,000 (841).

7.      Thus, PredictIt daily trader numbers in December 2022 have fallen to 35% of the long-term non-election period average of 1,400 traders per day.  Trading volume has fallen even more steeply to 24% of the pre-announcement average daily volume (long term average of 1.27 million shares per day in the year prior to the withdrawal announcement; post-December 7 average of 300,000 shares per day).  In other words, the market has already lost over three quarters of its pre-withdrawal announcement trading volume.  Weekday trading volume is now well below troughs observed on major holidays such as Christmas Day prior to the CFTC withdrawal announcement.

8.      This declining trading activity has left the substantial number of traders with 2024 positions locked into those positions.  The steep and continuing decline in trading activity means the market has already lost a substantial amount of pricing efficiency and it may effectively lock up well before the CFTC's shut-down

date on February 15 unless preliminary relief is granted.


I declare under the penalty of perjury that the foregoing is true and correct.


Executed on December 31, 2022

*/s/ John Phillips*
John Phillips